**UNITED STATESDISTRICT COURT SOUTHERN DISTRICT OF FLORIDA**

**Case No. 17-81370-cv-MIDDLEBROOKS/Brannon**

ANDREW HODGES, individually,

VLADIMIR COOD, individually;

GAUTAM DESAI, individually;

JODY POWELL, individually;

JEFFREY HEBERLING, individually; and

SHAMMI NABUKUMAR, individually;

ANTHONY SAJEWICZ, individually;

     Plaintiffs,

vs.

MONKEY CAPITAL, LLC, a Delaware limited liability company;

MONKEY CAPITAL, INC., a foreign corporation;

and DANIEL HARRISON, an individual;

    Defendants.

_____/

FILED by _____ D.C.

JUL 13 2018

STEVEN M. LARIMORE
CLERK U. S. DIST. CT.
S. D. of FLA – MIAMI

## INTRODUCTION TO MOTION TO DISMISS

I, DANIEL MARK HARRISON, Defendant, in the above styled

cause, am submitting upon request of the courts my confirmation of my intention to represent

myself *pro se*. With respect to the requirement to submit a confirmation on behalf of Monkey

Capital LLC, and Monkey Capital Inc., I am not authorised to submit such confirmations, not

being a principle of either company. As a *Pro Se* Defendant I am required to submit my current

address which is:

**THE SLOANE CLUB**
**LOWER SLOANE STREET**
**CHELSEA**
**LONDON**
**SW1W 8BS**

As *Pro se* Defendant in my singular capacity I submit the following ANSWER and MOTION
TO DIMISSS pursuant to lack of provided evidence as stipulated:

## ANSWER TO COMPLAINT

### Paragraph 1 of the Complaint is Denied

Given the submission table provided and the BTC/USD exchange rate at the point in time that
Coeval was sold (July 7, 2017; $2,549.50/BTC), the USD investment of 137.55 BTC is
equivalent to $350,780. This does not equate to "millions of dollars [*sic*] worth of
cryptocurrency" as alleged in the paragraph. Even if we are to take all respective investments by

the plaintiffs in COE on the alleged dates they were made and we are to calculate using the highest price within the alleged date range, we arrive at the following:

Andrew Hodges (July 14-17): $2170.30*50.003 BTC = $108,521.51

Vladimir Cood (mid-July – September): $4205*30 BTC = $126,150

Gautum Desai (early-July – mid-August): $4027.94*9.64 BTC = $40,564.54

Jody Powell (July 9, 2017 – July 14, 2017): $2,170.30*8.2 BTC = $17,796.46

Jeffrey Heberling (July 23, 2017 – September 21, 2017): $4507.45*3.745 = $16,880.40

Shammi NabuKumar (August 30, 2017 – Oct 20, 2017): $5,670.57*10 BTC = $56,705.70

Anothony Sajewicz (July 1, 2017 – Nov. 30, 2017): 10,678.60*26 BTC = $277,643.60

The result is $644,262.21. Therefore, even if every single plaintiff had purchased assets that were part of the Monkey Capital ICO at such a point as their existing cryptocurrency assets were at the highest possible point of exchange versus the United States Dollar (in itself an extremely improbable event) then this paragraph is still incorrect: "millions of dollars [*sic*] worth of cryptocurrency" were not committed to the Monkey Capital ICO by the plaintiffs. Given that plaintiffs would have most likely purchased Monkey Capital assets when the value of their holdings was lowest versus USD the likely value of cryptocurrency assets used to purchase Monkey Capital assets was most likely a fraction of the $600,000 sum, too, making this paragraph doubly incorrect. Evidence of the actual sums should have been provided with the complaint which was not the case here unfortunately.

Please produce any and all documents concerning the complaint to counter this statement of fact.

### Paragraph 2 of the Complaint is Admitted

For the reason that there was no product or marketplace yet developed, the ICO was delayed until further notice on August 8, 2017. In May 2018, once the product was fully developed, the ICO was held.

Please produce any and all documents concerning the complaint to counter this statement of fact.

### Paragraph 3 of the Complaint is Denied

The investor was never "given … cryptocurrency options called a [*sic*] Coeval." It was explicitly stated on July 7, 2017 that Coeval was a discount token given to those who were involved in the project and not sold by or endorsed by Monkey Capital in any way whatsoever. Investors were in fact steered away from purchasing COE and told that their functionality was similar to many options which made them extremely "hard to price". From the transcripts of the Monkey Capital Slack as stated by the defendant Daniel Mark Harrison on July 7, 2017: "*Since you ask … You can buy coeval off waves √ these are discounted tokens (put in coeval√btc) and then sell the coeval for MNY on the day. Don't tell anyone I told you this but this gets you 5x the number of tokens (look at the description of the coeval token and you'll see what I mean) "I actually did NOT mean to put this in the general chat room! LOL. Oh well we may as well leave it here now. But we don't bring it up again … OK I may as well explain what COEVAL is as there are a ton of questions about this. First of all, COEVAL are not sold by us; they are more like options that belong to various people in the project (I say they are LIKE that. They actually belong to some people in the project and some other people who when we made them we let have 5 COEVAL here and there just to see how this whole thing played out. Like I say, we are innovating with this market; we are doing things no one has done in crowdfunding EVER BEFORE. Now THAT is something I am proud of, yes.) They let the holder convert at a discount … I haven't encouraged people to go out buying up COEVAL for 2 reasons: there is mathematically complex issues in the price calculation of COEVAL-MNY and also it belongs to individuals, but if individuals who hold COEVAL wish to trade COEVAL that's their choice … I should probably be making an even bigger fuss about it. But as the ICO process began to get underway, I thought it was just one thing too many to discuss. Well, I mentioned it by accident in Slack last night (I thought it was a private chat I was on) and now I have had a zillion private questions about it, so … reap what you sew I guess. That's how COEVAL work anyway … I have not discussed it with the guys [the listing personnel at the exchange Waves] with respect to COEVAL and very much doubt I will bother as I am not sure I necessarily think it's a good idea to have them Green Ticked [officially listed]. Are you a gambler? Can you price events for killer profits? If yes and yes, try it. If no: steer clear of these kittens!*

Please produce any and all documents concerning the complaint to counter this statement of fact.

### Paragraph 4 of the Complaint is Denied

From the transcript of the Monkey Capital Slack: "*[COE] let the holder convert at a discount. There's 100,000 COEVAL in total, which means there is 1 COEVAL for every 1000 MNY, plus the 80% discount (which is to say 5-for-1). Therefore, 1 COEVAL has a price of 5000 MNY. Now, if the COEVAL you buy is 0.2 BTC, that means you paid about $500 or so for it. So, that would mean that we'd have to raise $10m for the COEVAL to have real value … As to what price COEVAL are worth buying at, hmmm … I am not gonna answer that. If 0.2 BTC ∨ COEVAL is $10m raised, then that just means you gotta guess how much we are gonna raise and buy below the price we are gonna raise at. Why did we create COEVAL? OK here is why: I love mathematical complexity and wanted to make the whole crowdfunding process a bit more fun and it's also part of the whole evolution of the product process we figured that could catch on. If you think about it, just as options price in the likelihood that a particular event will or will not happen, so do COEVAL price in confidence in the raise.*" The complaint alleges that COE (and MNY, the ICO currency) "allegedly derive their value from the usefulness and popularity of the Monkey Capital Market -- development and launch of which was entirely in Defendants' control." In fact, the opposite is the case. The amount that COE is valued at is herein clearly being explained as being entirely dependent on the amount that investors contribute to the ICO. The implication is that in the event that nothing is contributed to the ICO the COE is worth zero. The amount raised is clearly <u>beyond</u> the Defendants' control therefore, not in the Defendants' control.

Please produce any and all documents concerning the complaint to counter this statement of fact.

### Paragraph 5 of the Complaint is Denied

The ICO was delayed until further notice (see response to Paragraph 2).

### Paragraph 6 of the Complaint is Denied

There was never any "fundraising website" since no wallets were enabled on the Monkey Capital website and there were no directions to contribute cryptocurrency in any way on the website.

Further the website was not "taken down" as evinced by an archival search of the web address: https://web.archive.org/web/*/http://monkey.capital

Please produce any and all documents concerning the complaint to counter this statement of fact.

### Defendant is without knowledge as to Paragraph 7 of the Complaint
Notes: *conjecture.*

### Paragraph 8 of the Complaint is Denied.
See explanation as for Paragraph 4.

### Paragraph 9 of the Complaint is Denied.
COE was clearly illustrated as a discount token for the purpose of participating in the forthcoming ICO, much like a discount coupon in a department store offering. It is therefore not understood how COE resembles a security in any way.

To the extent that such discount coupons may benefit from similar pricing analysis as to that which is applied to options pricing in securities markets, this does not in and of itself mean that the article to which such analysis is applied is in any sense indicative of securitized status of COE, any more or less than one's ability to price the discount coupons in a department store can be undertaken using a vary crude variant of Black-Scholls' option pricing theory.

Please produce any and all documents concerning the complaint to counter this statement of interpretation of securities law along with a confirmation from the Securities & Exchange Commission that the statement made regarding the alleged securities fraud is valid. An allegation of securities fraud is a very serious claim and it is expected that the highest authority on the topic was consulted in writing and orally extensively with confirmation that securities fraud was a valid allegation here before filing against the Defendant. In such a case, prompt supplication of the necessary evidence to show that the Plaintiffs acted in responsible intent with respect to making such claims is required.

**Paragraph 10 of the Complaint is both Denied and Accepted.**

*Denied* - it has not yet been proven by Plaintiffs how COE were securities other than by indication that their discounted purchasing ability makes them so, and yet the purported fact is being restated in this paragraph.

*Accepted* – The purchasers of COE were clearly and evidently seeking to make a profit by reselling them. However, contrary to popular media commentary, that purchasers of an item seek to make a profit by buying and selling them bears little to no relevance on their status as securities (unless a battery of other criteria are met which make such profit-making intentions by and large non-circuitous).

Please produce any and all documents concerning the complaint to counter this statement of fact.

**Paragraph 11 of the Complaint is both Denied and Accepted.**

Defendants (being Daniel Mark Harrison and the parent company of Monkey Capital Pte. Ltd., Daniel Mark Harrison & Co. Pte. Ltd.) are clearly shown as having made a loss in the financial year of 2017 as per filed accounts with Singapore registry and Daniel Mark Harrison shows unpaid salary of approximately $40,000 (USD) by his employer for the financial year as well as a personal debt by the company still outstanding to him of around $300,000 (USD).

Please produce any and all documents concerning the complaint to counter this statement of fact.

**Defendant is without knowledge as to Paragraph 12 of the Complaint.**

*Conjecture.*

**Paragraph 13 of the Complaint is Denied.**

See responses to Paragraphs 4, 9, 10.

**Paragraph 14 of the Complaint is Denied.**

See responses to Paragraphs 3, 4, 9, 10.

**Paragraph 15 of the Complaint is Denied.**

The transaction in question is equal to $108,521.50. The Defendant does not admit that they "owe" Plaintiff Andrew Hodges said sum in any legal sense. When Andrew Hodges purchased COE in July 2017, the market value of all COE sold by Daniel Mark Harrison to Andrew Hodges was in excess of $1 million in USD (with an average daily liquidity of $500,000 / day), affording Andrew Hodges an immediate discount of around 90% (and an immediate realizable discount of approx.. 60%) on the then-USD value of the Bitcoin used by way of exchange for the COE. Please produce any and all documents concerning the complaint to counter this statement of fact.

Please produce any and all documents concerning the complaint to counter this statement of fact.

**Defendant is without knowledge as to Paragraph 16 of the Complaint.**

Transaction took place over an exchange and COE were not likely sold by Defendants.

**Defendant is without knowledge as to Paragraph 17 of the Complaint.**

Transaction took place over an exchange and COE were not likely sold by Defendants.

**Defendant is without knowledge as to Paragraph 18 of the Complaint.**

Transaction took place over an exchange and COE were not likely sold by Defendants.

**Defendant is without knowledge as to Paragraph 19 of the Complaint.**

Transaction took place over an exchange and COE were not likely sold by Defendants. Further, this sum was paid by Defendant to the Plaintiff as a discretionary non-contractual (thereby generously gifted) bonus payment for services rendered looking after the Monkey Capital Slack between July 2017 – September 2017.

Please produce any and all documents concerning the complaint to counter this statement of fact.

**Defendant is without knowledge as to Paragraph 20 of the Complaint.**

Transaction took place over an exchange and COE were not likely sold by Defendants.

**Defendant is without knowledge as to Paragraph 21 of the Complaint.**

Transaction took place over an exchange and COE were not likely sold by Defendants.

**Paragraph 22 of the Complaint is Denied.**

Monkey Capital LLC, if it exists as described, was not established by Daniel Mark Harrison but instead by Joshua Hawley, who was acting as chief operating officer in title for the Monkey Capital ICO. The company was never used and is dormant. As further evidence of the false nature of the claim that Monkey Capital LLC was used for any purpose as described in the Complaint, the company was established after the purchase of Coeval by a number of the defendants. This fact alone which is clearly verifiable should strike the matter of the possible involvement of Monkey Capital LLC obsolete.

Please produce any and all documents concerning the complaint to counter this statement of fact.

**Paragraph 23 of the Complaint is Denied.**

Monkey Capital Pte. Ltd., a Singapore-registered entity, is 50% owned by Daniel Mark Harrison & Co. Pte. Ltd. and 50% owned by a private shareholder unassociated with any of the Defendants commercially. The company is managed by another individual not listed in the Complaint and neither is Daniel Mark Harrison nor any entity he controls listed as a registered director of the company. The company has been dormant / inactive since inception (2016) and the ICO project was used in namesake only.

Please produce any and all documents concerning the complaint to counter this statement of fact.

**Paragraph 24 of the Complaint is Denied.**

Daniel Mark Harrison lives in the United Kingdom as per the first paragraph of this motion.

Please produce any and all documents concerning the complaint to counter this statement of fact.

**Paragraph 25 of the Complaint is Denied.**

**Defendant is without knowledge as to Paragraph 26 of the Complaint.**

*Conjecture.*

**Paragraph 27 of the Complaint is Denied.**

Refer to response to Paragraph 1.

**Paragraph 28 of the Complaint is Denied.**

Defendants have never operated within this district.

**Paragraph 29 of the Complaint is Denied.**

Defendant Andrew Hodges solicited Daniel Mark Harrison on several occasions for a direct sale of COE. Daniel Mark Harrison never solicited Andrew Hodges for the purchase.

Please produce any and all documents concerning the complaint to counter this statement of fact.

**Defendant is without knowledge as to Paragraph 30 of the Complaint.**

**Paragraph 31 of the Complaint is Denied.**

See response to Paragraph 28.

**Paragraph 32 of the Complaint is Denied.**

See response to Paragraph 28.

**Paragraph 33 of the Complaint is Accepted.**

**Paragraph 34 of the Complaint is Denied.**

While the content is true, the word "promise" is misapplied. The intention was stated that Monkey Capital would become a cryptocurrency news, information, decentralized hedge fund etc. as per mission statements made by almost every brand today. When Burger King states that

it offers the best-tasting burger this is not a promise; it is an aim/goal (i.e. no customer of Burger King can reasonably sue the restaurant for not fulfilling such).

Please produce any and all documents concerning the complaint to counter this statement of fact.

**Paragraph 35 of the Complaint is Accepted.**

**Paragraph 36 of the Complaint is Accepted.**
See responses to Paragraphs 3, 4, 9, 10.

**Paragraph 37 of the Complaint is Accepted.**
*add.* a comparable equivalency insofar as COE was a discount coupon.

**Paragraph 38 of the Complaint is Accepted.**

**Paragraph 39 of the Complaint is Accepted.**

**Paragraph 40 of the Complaint is Accepted.**

**Paragraph 41 of the Complaint is Accepted.**
Article clearly indicates paid for status in the footer section.

**Paragraph 42 of the Complaint is Accepted.**
Use of "falsely" is *conjecture* and therefore ignored in this response

**Paragraph 43 of the Complaint is Accepted.**

**Defendant is without knowledge as to Paragraph 44 of the Complaint.**
*Conjecture.*

**Paragraph 45 of the Complaint is Denied.**

This cannot be the case as a result of responses to Paragraphs 3, 4, 9, 10.

**Defendant is without knowledge as to Paragraph 46 of the Complaint.**

**Paragraph 47 of the Complaint is Accepted.**

This undermines the fact an ICO was held and destroys any Complaint as to an illegal securities offering.

**Paragraph 48 of the Complaint is Denied.**

**Defendant is without knowledge as to Paragraph 49 of the Complaint.**

**Paragraph 50 of the Complaint is Accepted.**

See response to Paragraph 47.

**Paragraph 51 of the Complaint is Denied.**

See response to Paragraph 6.

**Paragraph 52 of the Complaint is Accepted.**

See response to Paragraph 47.

**Paragraph 53 of the Complaint is Denied.**

No Fiat currency was ever accepted for sales of Monkey (MNY) on Waves DEX.

**Paragraph 54 of the Complaint is Denied.**

**Paragraph 55 of the Complaint is Denied.**

*Conjecture.*

**Paragraph 56 of the Complaint is Denied.**

See http://monkey.capital and http://m0nk3y.com for full update – even this lawsuit in its original incarnation as a falsely-accused Class Action is mentioned in order to update investors appropriately so that they could make a fair unbiased decision as to whether to join the (now declassified) Class Action.

Please produce any and all documents concerning the complaint to counter this statement of fact.

**Defendant is without knowledge as to Paragraph 57 of the Complaint.**
There is no ERC20 token.

**Paragraph 58 of the Complaint is Accepted.**
Not undertaken and such investors were ultimately rewarded substantial token bonuses. Also irrelevant to this case.

Please produce any and all documents concerning the complaint to counter this statement of fact.

**Paragraph 59 of the Complaint is Denied.**

**Defendant is without knowledge as to Paragraph 60 of the Complaint.**

**Paragraph 61 of the Complaint is Accepted.**
Mostly, this is the case where such tokens are indicated to represent some sort claim over the network asset.

Please produce any and all documents concerning the complaint to counter this statement of fact.

**Paragraph 62 of the Complaint is Accepted.**
Notes: see response to Paragraph 61.

**Paragraph 63 of the Complaint is Denied.**
See responses to Paragraphs 3, 4, 9, 10.

**Defendant is without knowledge as to Paragraph 64 of the Complaint.**

**Paragraph 66 of the Complaint is Denied.**

See responses to Paragraphs 3, 4, 9, 10.

**Paragraph 67 of the Complaint is Denied.**

See responses to Paragraphs 3, 4, 9, 10.

**Paragraph 68 of the Complaint is Denied.**

See response to Paragraph 1.

**Defendant is without knowledge as to Paragraph 69 of the Complaint.**

**Defendant is without knowledge as to Paragraph 70 of the Complaint.**

*Conjecture.*

**Paragraph 71 of the Complaint is Accepted.**

*Conjecture.*

**Paragraph 72 of the Complaint is Denied.**

See responses to Paragraphs 3, 4, 9, 10.

**Paragraph 73 of the Complaint is Denied.**

See responses to Paragraphs 3, 4, 9, 10.

**Paragraph 74 of the Complaint is Accepted.**

See response to Paragraph 47.

**Paragraph 75 of the Complaint is Denied.**

**Paragraph 76 of the Complaint is Denied.**

See responses to Paragraphs 3, 4, 9, 10.

**Paragraph 77 of the Complaint is Denied.**

See responses to Paragraphs 3, 4, 9, 10.

**Paragraph 78 of the Complaint is Denied.**

See responses to Paragraphs 3, 4, 9, 10.

**Paragraph 79 of the Complaint is Accepted.**

See responses to Paragraphs 3, 4, 9, 10.

**Paragraph 80 of the Complaint is Denied.**

Notes: see responses to Paragraphs 3, 4, 9, 10.

**Paragraph 81 of the Complaint is Denied.**

**Paragraph 82 of the Complaint is Denied.**

**Paragraph 83 of the Complaint is Accepted.**

Without "including the decision to engage in the sale of unregistered securities in furtherance thereof" for reasons as outlined in responses to Paragraphs 3, 4, 9, 10.

Please produce any and all documents concerning the complaint to counter this statement of fact.

**Paragraph 84 of the Complaint is Denied.**

See response to Paragraph 23.

**Paragraph 85 of the Complaint is Denied.**

**Paragraph 86 of the Complaint is Denied.**

**Paragraph 87 of the Complaint is Denied.**

**Paragraph 88 of the Complaint is Denied.**

There was not an ICO held in the period outlined.

**Defendant is without knowledge as to Paragraph 89 of the Complaint.**

*Conjecture.*

**Paragraph 90 of the Complaint is Denied.**

See responses to Paragraphs 3, 4, 9, 10.

**Paragraph 91 of the Complaint is Denied.**

see responses to Paragraphs 3, 4, 9, 10.

**Paragraph 92 of the Complaint is Accepted.**

See responses to Paragraphs 3, 4, 9, 10.

**Paragraph 93 of the Complaint is Denied.**

See responses to Paragraphs 3, 4, 9, 10.

**Defendant is without knowledge as to Paragraph 94 of the Complaint.**

**Paragraph 95 of the Complaint is Denied.**

See responses to Paragraphs 3, 4, 9, 10.

**Paragraph 96 of the Complaint is Denied.**

No solicitation occurred.

**Paragraph 97 of the Complaint is Denied.**

See responses to Paragraphs 3, 4, 9, 10.

**Paragraph 98 of the Complaint is Denied.**

See responses to Paragraphs 3, 4, 9, 10.

**Paragraph 99 of the Complaint is Denied.**

See responses to Paragraphs 3, 4, 9, 10.

**Paragraph 100 of the Complaint is Denied.**

See responses to Paragraphs 3, 4, 9, 10.

**Paragraph 101 of the Complaint is Denied.**

**Paragraph 102 of the Complaint is Denied.**

See responses to Paragraphs 3, 4, 9, 10.

**Paragraph 103 of the Complaint is Denied.**

See response to Paragraph 11.

**Paragraph 104 of the Complaint is Denied.**

**Paragraph 105 of the Complaint is Denied.**

The repayment to Andrew Hodges is non-legally binding and non-inclusive of legal costs.

**Paragraph 106 of the Complaint is Denied.**

See responses to Paragraphs 3, 4, 9, 10.

**Paragraph 107 of the Complaint is Denied.**

See responses to Paragraphs 3, 4, 9, 10, 11.

**Paragraph 108 of the Complaint is Denied.**

See responses to Paragraphs 3, 4, 9, 10.

**Paragraph 109 of the Complaint is Accepted.**

See response to Paragraph 10.

**Paragraph 110 of the Complaint is Denied.**

See responses to Paragraphs 3, 4, 9, 10.

**Paragraph 111 of the Complaint is Accepted.**

**Defendant is without knowledge as to Paragraph 112 of the Complaint.**

See responses to Paragraphs 3, 4, 9, 10.

**Paragraph 113 of the Complaint is Denied.**

See responses to Paragraphs 3, 4, 9, 10.

**Paragraph 114 of the Complaint is Denied.**

This accusation of criminality (and others like it in this Complaint) have no place in a Civil filing and may be subject to abuses of the United States Constitution and other national United States civil rights laws.

Please produce any and all documents concerning the complaint to counter this statement of fact.

**Paragraph 115 of the Complaint is Denied.**

**Defendant is without knowledge as to Paragraph 116 of the Complaint.**

**Defendant is without knowledge as to Paragraph 117 of the Complaint.**

**Paragraph 118 of the Complaint is Denied**

No funds were solicited.

**Defendant is without knowledge as to Paragraph 119 of the Complaint.**

See response to Paragraph 114.

**Defendant is without knowledge as to Paragraph 120 of the Complaint.**

See response to Paragraph 114.

**Defendant is without knowledge as to Paragraph 121 of the Complaint.**

See response to Paragraph 114.

**Paragraph 122 of the Complaint is Denied.**

See responses to Paragraphs 3, 4, 9, 10, 114.

**Paragraph 123 of the Complaint is Denied.**

See responses to Paragraphs 3, 4, 9, 10, 114.

**Paragraph 124 of the Complaint is Denied.**

**Paragraph 125 of the Complaint is Denied.**

**Paragraph 126 of the Complaint is Denied.**

See responses to Paragraphs 1, 3, 4, 9, 10, 114.

**Defendant is without knowledge as to Paragraph 127 of the Complaint.**

**Defendant is without knowledge as to Paragraph 128 of the Complaint.**

See response to Paragraph 114.

**Paragraph 129 of the Complaint is Denied.**

**Paragraph 130 of the Complaint is Denied.**

See response to Paragraph 114.

### Paragraph 131 of the Complaint is Denied.

### Paragraph 132 of the Complaint is Denied.

### Paragraph 133 of the Complaint is Accepted.

See responses to Paragraphs 3, 4, 9, 10, 114.

### Paragraph 134 of the Complaint is Denied.

### Paragraph 135 of the Complaint is Denied.

With the exception of Andrew Hodges.

### Paragraph 136 of the Complaint is Denied.

### Paragraph 137 of the Complaint is Denied.

### Paragraph 138 of the Complaint is Denied.

### Paragraph 139 of the Complaint is Denied.

## <u>OTHER PROBLEMS (1): ATTORNEY SOLICITATION</u>

THE DEFENDANT WAS forced to resign the attorneys who initially agreed to represent him on the grounds of legal advice obtained by other third-party attorneys that solicitation of Defendants is largely disallowed by the United States courts.

The Defendant has researched the topic enough to understand that this advice is sound with respect to defendants of securities fraud allegations.

In December 2017, days after the suit was filed by the Plaintiffs, the Defendant was contacted by Doug Greene, National Practice Leader, Securities and Governance Litigation Team at BakerHostetler who was then Chair of the Securities Litigation Group at Lane Powell PC in Seattle.

The communication was initiated by Mr. Greene and a full transcript of such communication is provided below:

    Message List
- Doug Greene sent the following message at 8:46 PM

**View Doug's profile**

**Doug Greene**

**Doug Greene**

**Defense of securities suit**

Hi Mr. Harrison: I defend securities class actions around the US, including Florida. I'm sorry that you were sued. I would appreciate the chance to meet, at my expense, to discuss whether I'd be the right lawyer to defend you. At our meeting, I 'd walk through a detailed analysis of the claims and your defenses, along with my proposed budget and team. Are you free to meet later this week or next week? I'm currently free any day other than the 1/3-4 (court in NYC). In the meantime, please feel free to call me on my cell phone any time: 206-930-7682. To help you get to know me, please take a look at my LinkedIn profile, and here's a short video about me and my practice:**https://vimeo.com/228576054**. I can also send you a proof of my forthcoming book, "A Guide to Successful Defense of Securities Class Actions," if you'd like--just let me know. Best regards, Doug

- Daniel Mark Harrison sent the following messages at 1:55 AM

**View Daniel Mark's profile**

**Daniel Mark Harrison**

**Daniel Mark Harrison**

Hi Doug - Your video is really appealing. The chief council on the case for now is a sort of CLO hire who's a lawyer from Philadelphia I picked up from the community some time before this became a manifest reality, as a lot of slander, libel etc. was taking place at the time for quite a period. He has been helpful and we are looking at several law firms and someone who can lead this effort as I am willing to spend. One thing I will tell you: I am the innocent victim in this. If you can get on board with that mindset and we can not only defend the case strategically and definitively but also go after everyone who caused this and make

them understand that real actions have real consequences then that stands for a lot. Can I ask by way of background that you have a read through the attached document (from the new WP) and e-mail me at dmh@dmh.co so I can CC you into Ken (Kapner)? The case you have read is 100% factually inaccurate and these are not stable or sane individuals. -- Daniel

Download BACKGROUND-fromWP.pdf

**BACKGROUND-fromWP.pdf**

54 KB

**Download**

- **View Daniel Mark's profile**

Daniel Mark Harrison

Daniel Mark Harrison

Download BACKGROUND-fromWP.pdf

**BACKGROUND-fromWP.pdf**

54 KB

**Download**

- Doug Greene sent the following messages at 2:31 AM

View Doug's profile

Doug Greene

Doug Greene

Hi Daniel:

- **View Doug's profile**

Doug Greene

Doug Greene

Thanks for your response. I'll send you an email in a moment and will read over the white paper. I certainly can appreciate that you're the innocent victim. As you can see from the video and the class action book I'll send with my email, I focus my energy on defending my clients' integrity and honesty first and foremost, and it would be a privilege to defend yours. Please stand by for an email. Doug

- Daniel Mark Harrison sent the following message at 3:25 AM

View Daniel Mark's profile

Daniel Mark Harrison

**Daniel Mark Harrison**

Hi Doug, Thanks for these. Yes - I do see that this honesty and integrity part is vital to you, and that really is the most important thing to me as well, so we are on the same page. Maybe we have a call tomorrow if you are free - you and I, that is? Just give me a good time EST and we can set something up. - Daniel

- Doug Greene sent the following messages at 3:59 AM

**View Doug's profile**

**Doug Greene**

**Doug Greene**

My only unavailability is about 4:30 - 7 pm EST. Would you rather talk Wednesday night SGT or Thursday morning SGT? If Wednesday night SGT, let's set it so that you don't have to stay up late--say 10 am EST. If Thursday morning SGT, let's do it so that it's not too early for you--say 9 pm EST? Either is fine with me.

- **View Doug's profile**

**Doug Greene**

**Doug Greene**

P.S. I can also do it earlier on Wednesday evening SGT if it would be better. I'll be up and working but would just need to juggle one family thing -- would would be no problem.

- Daniel Mark Harrison sent the following messages at 3:43 PM

**View Daniel Mark's profile**

**Daniel Mark Harrison**

**Daniel Mark Harrison**

Sorry Doug - I am in the UK as it happens

- Let's just coordinate in EST wherever you and I happen to be in the world henceforth I think :)
- Or we shall forever be juggling 13, 8, 5, 3 etc. hours time differences
- Today is Wed; what times EST is good for you?
- Download Dear Community Members.docx

**Dear Community Members.docx**

134 KB

**Download**

- You may wish to see my plans for the project and letter to the community I will be sending out beforehand

- I am drawn to you as you like a guy who can win stuff
- I am a guy who can win stuff so "ghost see ghost" as the Chinese say
- Download Dear Community Members.docx

**Dear Community Members.docx**

134 KB

**Download**

- Doug Greene sent the following messages at 5:09 PM

**View Doug's profile**

**Doug Greene**

**Doug Greene**

Hi Daniel: Thanks for the confidence in me--I'm very grateful--and and thanks for sending the community letter. Let's plan to talk at 1 pm Eastern, if that's not too late for you. I will not have completed my check for conflicting matters, so we'll have to keep the discussion on the basis of public information. After I determine we have no conflicts, we can turn to confidential discussions, likely tomorrow or Friday. I'd be ready and able to dig in if we have no conflicts, and would be honored to be able to help you through this so that you can completely focus on the important work you do.

- **View Doug's profile**

**Doug Greene**

**Doug Greene**

Please confirm that 1 pm Eastern works. I can speak later, until about 4 pm Eastern if that's better. I'm a bit logistically challeged today--I'm with a houseful of relatives until tomorrow morning, so I'm going to sneak out of the house for the call. But I should be able to manage fine for our initial call. Thanks again. Doug

- **View Doug's profile**

**Doug Greene**

**Doug Greene**

Hi Daniel. I'm in a good place to talk. Please call my cell when you're able. 206-930-7682. I like your plan about coordinating on EST—good idea!

- **View Doug's profile**

**Doug Greene**

**Doug Greene**

Hi Daniel. I'm going to change locations and will be back available at 2:10 ET. Please call my cell phone when you can. I'll be free until 4 ET and then after about 7 pm ET. Doug

- **View Doug's profile**

**Doug Greene**

**Doug Greene**

Hi Daniel. Quick update. I need to head to my family event at 3:30 ET, not 4 pm. Can talk until 3:30. Will be back in touch around 7 pm ET.

- **View Doug's profile**

**Doug Greene**

**Doug Greene**

Hi Daniel: My firm has no conflict. I mulled over strategy today and am excited to hear more and dig in, if you'd like me to represent you. My schedule on Thursday is (all ET, as is our plan): free from about 6 - 7:30 am, traveling from 7:30 am to about 3 pm and mostly unavailable during that time, and free from 3 pm on. My schedule Friday is wide open. Also, please let me know if you'd like me to meet with you in the UK or Singapore--I'd be happy to visit you in the coming days.

- **View Doug's profile**

**Doug Greene**

**Doug Greene**

Hey Daniel: Just checking back about talking. I'll send a note to your email too, in case you're away from this account. I'll be free tomorrow if that works for you. Doug

- **View Doug's profile**

**Doug Greene**

**Doug Greene**

Hi Daniel: I don't mean to bug you. I was standing by to talk on the 27th and haven't heard from you. I want to make sure you're ok—can you please let me know? I'd love to help you — ideally to represent you but if I'm not right person, to help you find the right one. So please let me know either way. Thanks!

Clearly this is a violation of the acceptable practice of governance regarding non-solicitation of Defendants in the United States courts. Further backing up this claim, in Corporate Technologies Inc. v. Harnett, et al. the Judge found that the nature of the solicitation was what constituted solicitation. In this particular case, solicitation is impossible to reasonably dispute on either the fundamental viewpoint or the interpretational viewpoint as supplied in the Corporate Technologies Inc. v. Harnett, et al. case.

More can be found in summary here:

http://www.abajournal.com/magazine/article/top_10_ethics_traps?icn=most_read

The reason this point is important is that it unfairly biased the judgement of the Defendant early on in the case and if brought to trial would likely be a serious contending argument for mistrial. At the very worst it suggests that the Plaintiffs legal firm Silver Miller and Doug Greene were in communication with one another in advance of the court filing and looking for a "quick settlement"

This idea is further substantiated by private communications held with one of the Plaintiffs in mid-June in which the Plaintiff told the Defendant that Silver Miller had communicated to their client that the Defendant's legal council Doug Greene was in settlement negotiations with the Plaintiff's lawyers when the Defendant fired his lawyers ad hoc. On the contrary, the Defendant was never informed he was in negotiations for settlement with the Plaintiffs and has always disputed the allegations and potential settlement. Evidence of these communications can be provided to the courts if required although for time-saving purposes and in order to submit this motion as swiftly as possible the claim is being added to the numerous burden of potentially negligent legal activity induced by Silver Miller law firm.

### <u>OTHER PROBLEMS (2): CONFESSED LACK OF SUBSTANTIAL KNOWLEDGE</u>

In a May 2018 article printed in CoinTelegraph.com that was subsequently removed from the site Jason Miller said that he was "not smart enough to understand use-cases in cryptocurrencies." If utility is so misunderstood by the Plaintiffs' legal team, this suggests that the securities fraud allegations are nullified. Utility and value interplay are critical to the definition and construct of securities and it is unthinkable that an attorney prosecuting an alleged civil securities lawsuit would so cavalierly claim not to have the requisite knowledge of such legal detail while simultaneously accusing an entrepreneur of such "crimes".

Once again the Defendant offers to provide evidence of such transcript although for this purpose CoinTelegraph.com can be served a subpoena and asked to submit such documentation confirming this statement which is the suggested course of action since it is impartial.

By way of example from the actual published MNY White Paper in June 2018:

**ABSTRACT:** Cryptocurrencies have the potential to offer investors unrivalled returns as a result of their unique value-utility properties such as limited supply quotas and exponential payment utility. In the past decade, we have all seen the effects of this as Bitcoin has surged more than 1 million percent and other cryptocurrencies such as ETH and more recently, XRP, have followed similarly. However, what is less understood is that the invention of smart contracts by Vitalik Buterin in 2015 has now given rise to a potential form of value inflation that is not covariant on market hype or randomness. Rather, we are in a stage of potential Blockchain evolution now wherein developing cryptocurrencies with more than 1 million percent plus value inflation events are not just achievable but can be continually repeated and sustained. I show how by synchronising basic escrow functions and token issuance cycles between smart contracts how it is possible to develop what is in effect the world's first inflatable form of cash value. I detail how a synthetic income swap utility employing the smart contract function enables any calculation of a cryptocurrency asset via standard discounted cashflow mechanisms, in effect, putting cryptocurrencies on par with securities, real estate and any number of income-generating assets. In doing this, I identify the first ever synthetic income cash instrument. I answer specific questions about the veracity of the huge performance gains inherent in cryptocurrencies and show how they are non-pyramid-biased and are in fact, entirely market randomized returns similar to those of any others in most investment products. Finally, I show how this non-securitised form of cash synthetically mimics core Blockchain functions and coding in value form, which may be of significant consideration with respect to innovation trends on Blockchain in general.

I.       CALCULATING FINANCIAL VALUE FOR BLOCKCHAIN ASSETS

**1. Introduction: The History of Money**

Money as we know it today has been a feature of our world since around 800 BC – 600 BC, when the first coins were minted in Turkey between the reigns of King Alyates II and Queen Hermodike II. Coins were first minted with the exact amount of metal stipulated and only later during Roman times did coins become regularly debased and did seigniorage become a feature of the manufacture of cash instruments. Separately, the Chinese Emperor Qin Shi Huang introduced a copper coin in about 200 BC which was made with a hole through the middle of it, affording it additional mobile utility by way of being able to be carried on the back of horses via a single string that ran through the coins' center as opposed to in much heavier ceramic pots. While the Chinese were some centuries late to adopt the concept of coinage versus western societies, their invention of the paper note in the $7^{th} - 11^{th}$ century predates the earliest form of paper money in Europe by around half a millennium. Around 1700, banks in England began independently printing banknotes which could, once brought into the bank, be exchanged on the spot for a pre-agreed amount of silver. Thus, in their original form, bank notes were nothing less than securities according to the contemporary definition – that is to say, promises to pay the bearer a fixed agreed amount of money on a certain date in the future. Notes were designed with the intent of being able to represent larger sums of underlying base metal and to be more convenient to draw on. Later they became effective fundraising instruments for British banks, since customers would seldom exchange their notes for metal and thus a greater amount of value could be issued than was held in vaults by the banks.

**2. Digital Notes: The Evolution of Cryptocurrencies from Tokens to Proxy Coins**

Cryptocurrencies began with the creation of Bitcoin in 2009 by a pseudonymous programmer named Satoshi Nakomoto. All cryptocurrencies from the time of Bitcoin up until the Ethereum Virtual Machine went live in 2015 were referred to as digital coins. When Ethereum was invented, the creator Vitalik Buterin proposed a method of digital currency manufacture on top of its protocol whereby tokens could be constructed by entering a few lines of code into the Ethereum Blockchain and paying the miners in ETH, the network's local currency, for verifying the creation of the tokens. In economic terms, token money is money where the unit's face value exceeds the cost of production of the unit.

Nearly all money today in circulation can be considered token money. Blockchain Tokens bear a remarkably similar relationship to digital coins in that with the minting of a digital coin, the face value may exceed the cost of production according to the market but it is still in part determined by the electricity cost in producing it.

With digital tokens, cost of production is so negligible that sale price is always greater than production cost no matter what.

Given that Blockchain is now one decade into its evolution as a financial technology (albeit it even if it is not yet one adopted by the major part of society), it becomes only logical to ask – what are the characteristics, the functions and what is the utility of digital notes?

A digital note ideally ought to answer a question commonly asked since the gold standard was abolished by President Nixon in 1972 and one which you hear commonly asked on Blockchain today. That question is: what is the real value property of a unit of currency?

Given that notes began life as promissory paper, we can easily simulate such a scenario without necessarily securitising the product by enabling a re-exchange of the token for its original unit of purchase as a result of the smart contract's ability to escrow sums of payment for extended period of time. For example, if someone pays 1 ETH for a token we create on the Ethereum network, we can extract a fee for the manufacturing process and innovation of the token and subsequently we can allow the remaining portion of the ETH to be held securely in the token's smart contract until a certain date in the future when it can be re-exchanged for the token that it was first used to purchase.

If we alter the algorithm between issuance of the tokens and re-exchange of the tokens with the ETH in the smart contract, for instance by progressively issuing less tokens per ETH entered into the smart contract at point of issuance and then equalising all re-exchanges of tokens and underlying cryptocurrency in the smart contract on a fixed like-for-like basis, the result is one whereby a leverage effect in terms of the price of the initial unit of digital currency used to pay for it is created by the holder commonly getting back more ETH than they submitted initially. It was on this basis that we first created Futereum in January 2018. Thus, Futereum can be considered the world's first digital note.

At heart, a digital note is nothing more than a proxy digital coin, or a proxy digital token, being the unit of token money value that is employed in temporarily representing the digital coins in the token's smart contract prior to re-exchange. Because digital notes represent actual cryptocurrencies that they are in some sense categorically themselves, as opposed to an alternate form of value such as when a paper note represented a pound of silver, the effect is one whereby digital notes are able to be employed in leveraging and artificially magnifying potential investment returns for digital currency investors across a broad range of digital assets, and employing a whole series of highly-imaginative cost-of-sale formulas that ultimately affect the price of the notes themselves. In this way we are the first to have identified how to engineer not just utility but also value on the Blockchain.

To summarise, a digital coin is a unit of cryptocurrency attached to the creation of a specific Blockchain. A digital note is a smart contract utility-enhanced token where the token is used by way of being ascribed a proxy value for the underlying value that is stored inside the smart contract for which the token is ultimately re-exchanged.

### 3.   Value Reflection & Value Loading In Digital Notes

Digital notes can be expressed in the form of any token with a smart facility where the escrow function in the token's smart contract or similar facility represents a possible storage place for any sort of crypto value for a period of time. Digital monetary instruments, as for any monetary instrument, rise in value the higher the value of the goods they purchase rise in price. This is not a well-understood process, but it is a process I have identified in both real and in digital economies. It is easier to identify in digital markets due to constrained supply of digital assets, making such trends more noticeable. We can call this scenario where a type of value is conferred onto the currency as a result of the currency being able to purchase an asset of a comparatively higher price value for what it is: *reflection*.

Value reflection is still not very well understood. An example is where 100,000 tokens are enabled to purchase 100,000 shares of a company at the value of $5 per share. In such a case, the tokens would immediately have $500,000 of *reflected value*. If they did not, someone else would simply purchase the tokens under that sum and then use them to purchase the shares which they would sell for a marked-up price to make an arbitrage profit.

When a smart contract such as Futereum holds Ether inside it, the value reflection of the ETH reflected on the price of the FUTR or FUTX digital note is essentially internally-reflected value that is somehow part of the character of the digital note. The process by which this value reflection comes about however does so slightly differently to that of most currencies, for it is only created at point of purchase.

Thus, value loading is the term we use to describe the moment when ether (or whatever other digital asset is being employed as the unit of purchase) is sent to the smart contract, safely-stored there and where the newly-issued digital note is simultaneously sent from the same smart contract to the purchaser with the additional utility of being re-exchangeable at some point with a greater or lesser amount of that initial purchase asset.

**4.   Intrinsic Value of Digital Notes**
Digital Notes have an additional dimension of utility to most cryptocurrencies in their potential for re-exchange as units of proxy digital coinage with the original purchase asset stored in the smart contract. As a result of this additional dimension of Utility, digital notes also have an additional dimension of value that very significantly makes them far more conventional monetary instruments than standard cryptocurrencies. This is because whereas valuing most cryptocurrencies involves using a variety of experimental formula and "best-guess" approaches, valuing digital notes is no different at all to valuing any investment is. When undertaking an investment valuation, aby far the most common approach is to use a discounted cashflow analysis to arrive at a net present value of the asset being valued.

The formula for calculating DCF for an asset value in present terms that is three years into the future from now is expressed as follows:

$$PV = CF_1 / (1+k) + CF_2 / (1+k)^2 + CF_3 / (1+k)^3 + [TCF / (k - g)] / (1+k)^{n-1}$$

where $PV$ = present value, $CF_i$ = cash flow in year $I$, $k$ = discount rate, $TCF$ = the terminal year cash flow, $g$ = growth rate assumption in perpetuity beyond terminal year and $n$ = the number of periods in the valuation model including the terminal year.

Presently, no digital asset can be valued this way as there is not an expected income receipt from a cryptocurrency, since its utility is purely that of a payment utility. Indeed, prior to the advent of cryptocurrencies, which due to limited supply quotas, tended towards big increases in value as a result of a more exponential demand function than availability permitted at equilibrium value, it was never imagined that currencies themselves would resemble income assets. Currencies prior to cryptocurrency innovation were merely mechanisms with which to pay with things for, and were only materially worth speculating on the direction of against one another by applying substantial (1,000% in many cases) portions of leverage.

With digital notes, however, there *is* an income receipt that is expected at some point in the future. This income receipt while not specifically a classifiable dividend or such is nevertheless manifest in the form of a re-exchange of the digital notes with the original units the notes were purchased with.

For example, when we purchase 114 FUTR for 1 ETH while the Futereum smart contract is selling in the first of ten tiers, by the time the exchange of all FUTR and all Ether takes place, assuming that the total number of tokens that count be issued are so in year two, then we would be able to value the FUTR's net present value discounting the asset at a comparable rate of return we might achieve in the underlying asset.

So, let's assume that ETH is $500 today, and that I expect to receive 8.5x the amount of Ether form the Futereum smart contract as per the realistic probability of doing so if all the tiers of the smart contract are sold out somewhere in year two. The Futereum smart contract will not accept any re-exchange until year 3 if that is the case. Further, I estimate that I make around 50% profit per year trading comparable cryptocurrencies. Therefore:

$$((-500)/(1+50\%))^1+(0)/(1+50\%)^2+(4250)/(1+50\%)^3+(1,687/50\%-25\%)/(1+50\%)^3-1$$
$$= \$1332.26$$

The result is that the value I have obtained from the Futereum smart contract's functionality is $1332.26 per Ether, representing what is a time-adjusted equivalent present value of an additional $832.26 when Ether is in the form of a Futereum digital note.

Presciently, the DCF formula can be used to certify whether holding the actual underlying asset or whether purchasing whatever digital note proxy coin equivalent is a better bet. For instance, assuming that the appreciation of Ether is expected to be around 1000% per year for the next 3 years then:

$$(-500)/(1+1000\%))^\wedge 1 + (0)/(1+1000\%)^\wedge 2 + (500000)/(1+1000\%)^\wedge 3) + (500000/50\%-25\%)/(1+1000\%)^\wedge 3 - 1$$
$$= \$1,080.52$$

In this case, my expected value for Ether in 3 years' time is $500,000, since Ether is growing at a rate of an additional 1000% per year. The value at which I invest my $500 is enhanced with an additional $508 once the Ether is inside the Futereum smart contract, making Futereum digital notes an extremely worthwhile trade. This is in spite of 1000% annualized returns compounded over 3 years!

Clearly, the ability to calculate currency values on the same basis that we do income-generating assets is a unique and unchartered innovation prospect.

The flexibility of digital notes to make permissible discounted cash-flow valuations of cryptocurrency utility is perhaps the most exciting aspect of the smart contract build in terms of wider application to the investment world, for in allowing such valuations to be performed, digital notes can be compared on a like-for-like basis directly with all sorts of investments, such as real estate, stocks, bonds and others.

Further, such investments now that they have a discounted future value based on a specific income ratio equivalent, can be ascribed multiples for trading, in the way that securities are valued via the business cash flows.

Remarkably, all this is made possible without securitizing a single portion of the digital currency unit as well, inviting the possibility for significant levels of disruption in equity and securities markets henceforth over the next few years.

## 5.   MNY As a Digital Note

MNY is a unique type of digital note as a result of its *loaded reflected value* attributes. MNY receives FUTR and FUTX as a form of payment and is made available for sale according to a price history identical to that of Bitcoin's historical trading cost multiplied by the value of one FUTR and/or FUTX per every $10 expenditure in Fiat terms. This results in a number of different scenarios.

First of all, MNY is usually either cheaper or more expensive to purchase on an intrinsic basis in either FUTX and/or FUTR at any one time and/or depending on the amount of MNY an investor is seeking to purchase, and rarely are the two likely to compare in terms of true value. Unless both currencies are mineable via ETH at exactly the same level at the same point in time, depending on the amount of FUTR an ETH holder is looking to purchase via smart contract and/or on exchange, four purchase alternatives are possible:

1)   Purchase FUTR with ETH via smart contract and mine MNY
2)   Purchase FUTX with ETH via smart contract and mine MNY
3)   Purchase FUTR with COE (or another cryptocurrency) via exchange and mine MNY
4)   Purchase FUTX with COE (or another cryptocurrency) via exchange and mine MNY

MNY receives FUTR and FUTX as a unit of purchase. FUTR and FUTX are received as a unit of purchase for ETH. Therefore, MNY is a "proxy of a proxy" for ETH. The result is one where at the end of 21 million units of MNY issuance, all MNY is equally exchangeable for a lilke-for-like percentage sum of FUTR and FUTX that is stored in the smart contract.

Because FUTR and FUTX both store ETH in their own smart contracts, and yet much of the ETH that is stored therein is likely to become unswappable for a long period of time as a result of the time that the ether proxy spends in the MNY smart contract (and is therefore non-exchangeable with ether for that period) the amount of ETH per FUTR and per FUTX is likely to increase a lot during the period that FUTR and FUTX are in the MNY smart contract. Thus, at the point of re-exchange, which is to say, at the point when MNY switches for the FUTR and FUTX distributed share that was used to purchase it, the amount of ETH per FUTR/FUTX received per MNY could be much greater than the anticipated 1 ETH / 34 FUTR average that is currently the case in forecast Futereum outcomes. In fact, it may well be the case that more than 1 ETH per 1 FUTR and 1 FUTX is the resultant exchange amount. Either way, with 1 MNY being exchangeable for approximately 80 FUTR, the resultant outcome whereby even the highest level of value obtainable on a per-level / cycle ratio, wherein 1 ETH is the cost of 2 FUTR, the ROI for all MNY sales is net positive.

Therefore, if we want to calculate a very simple net present value for one ether invested in either FUTR or FUTX at the point that Futereum token is invested in MNY the calculation on a discounted cash-flow basis is:

$$((-500)/(1+50\%))^1*80+(0)/(1+50\%)^2+(4250)/(1+50\%)^3+(1,687/50\%-25\%)/(1+50\%)^3-1$$
$$= (\$1332.26*40\ FUTR/ETH)/(1+50\%)^3-1$$
$$= \$15,788.75$$

This exponent on this calculation shows the power of the MNY mining tool when used in conjunction with the FUTR/FUTX tokens. Specifically, 1 ETH with the value of $500 has a net present value automatically, merely by positioning of the FUTR into the MNY smart contract, of over $15,000. The result is a net present value gain of 29,000%, and this is discounting at an aggregate compound rate of 50% a year, an incredibly unlikely event in and of itself.

Please produce any and all documents concerning the complaint to counter this statement of fact. Please use mathematical examples as well as examples of specific cryptocurrency instruments to support the allegations of securities fraud made in the Complaint **and with very specific reference to the below argument (since this concerns the ICO event in question):**

In this case, the actual exchange is not securitized simply because of the swap status between two assets that have been confirmed by the Securities & Exchange Commission as de facto *non-securities*. The complexity whereby an income calculation was performed on the product representing a non-securitized net present value discounted by the expected future return indicates exactly how brazen proclamations of "securities fraud" need substantially more factual basis than a mere "he said she said and the media said" basis.

Either way, without being able to identify "use cases" of cryptocurrencies the point here is that one may assume that a proxy ETH coin – i.e. a proxy for an asset that the SEC has explicitly declassified as a non-security instrument – was in fact a security when that is not the case.

At a very minimum, the foundation of philosophical, legal and mathematical criteria (all of which must be considered in any legal verdict as for all classes of rational decision-making) which the Defendant is using to substantiate the status of the asset as a non-security is clearly beyond the scope of the Plaintiff's legal team, who are at best using a bogus class action claim to destroy the reputation of an honest entrepreneur for their own financial and political gain. This in itself once again qualifies as potentially material that may lead to a mistrial if a trail is the culmination of the result of this case. This in turn substantiates further argument for dismissal of the Complaint.

## **MOTION TO DISMISS**

<u>GIVEN THE SEVERITY</u> and quantity of problems arising out of this case, and the damage already incurred to the Defendant from the outset, but with particular reference to the evidence supplied by the Defendant in light of no presentation of evidence to both prove the claims made in the Complaint and to disprove the evidence supplied herein in this Answer, Defendant hereby moves to dismiss the Plaintiffs' Complaint with prejudice unless evidence countering every request for evidence herein provided is submitted by July 13, 2018.

JULY 13, 2018                                              Respectfully submitted,

                                                          <u>DANIEL MARK HARRISON</u>
                                                          DEFENDANT

                                                          <u>N/A (PRO SE)</u>
                                                          Attorney Bar Number *(if applicable)*

                                                          <u>N/A (PRO SE)</u>
                                                          Attorney E-mail Address *(if applicable)*

                                                          Telephone: TEL: +44 20 7730 9131

### Certificate of Service

**I hereby certify** that a true and correct copy of the foregoing was served by
<u>DANIEL MARK HARRISON</u> by electronic service to DAVID SILVER at
<u>dsilver@silvermillerlaw.com</u> and to JASON MILLER at <u>jmiller@silvermillerlaw.com</u> on
FRIDAY 13 JULY, 2018 on all counsel or parties of record on the Service List below.


_____

DANIEL MARK HARRISON, DEFENDANT


### SERVICE LIST

<u>JASON MILLER & DAVID SILVER, ESQS.,</u>
**<u>Florida (Main) Office</u>**
<u>11780 W Sample Road</u>
<u>Coral Springs, Florida 33065</u>
<u>Phone: (954) 516-6000</u>
Attorneys for Plaintiff