## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

Case No. 17-81370-CV-MIDDLEBROOKS

ANDREW HODGES, an individual;
VLADIMIR COOD, an individual;
GAUTAM DESAI, an individual;
JODY POWELL, an individual;
JEFFREY HEBERLING, an individual;
SHAMMI NABUKUMAR, an individual; and
ANTHONY SAJEWICZ, an individual;

      Plaintiffs,

v.

MONKEY CAPITAL, LLC, a Delaware limited liability company;
MONKEY CAPITAL, INC., a foreign corporation;
and DANIEL HARRISON, an individual;

      Defendants.

_____/

## FINAL DEFAULT JUDGMENT AGAINST DEFENDANTS
## MONKEY CAPITAL, LLC, AND MONKEY CAPITAL, INC.

THIS CAUSE is before the Court upon Plaintiffs' Motion for Final Default Judgment, filed on July 13, 2018. (DE 26).  For the reasons set forth below, the Motion is granted in part and denied in part.

## I.    BACKGROUND

### A.  Procedural History

On March 7, 2018, Plaintiffs filed an Amended Complaint for damages and equitable relief against MONKEY CAPITAL, LLC, a Delaware limited liability company; MONKEY CAPITAL, INC., a foreign corporation (collectively referred to herein as "MONKEY CAPITAL" or "Defendants"); and Daniel Harrison, an individual ("Harrison"). (DE 28 or "Amended Complaint").

Plaintiffs commenced this action against Defendants, alleging they contributed cryptocurrency worth millions of dollars in advance of a scheduled Initial Coin Offering (ICO) and supposed launch of a private cryptocurrency exchange and decentralized hedge fund (the "Monkey Capital Market").  Plaintiffs state that the ICO never occurred, the status of the development of the Monkey Capital Market is unknown, and that Defendants unlawfully pocketed investor money.

All Defendants have been served (DE 7, DE 18, DE 19), however no Defendant is presently represented by counsel.  The clerk has entered default as to all Defendants (DE 31, DE 34, DE 35), and on May, 21, 2018, Plaintiffs filed a Motion for Final Default Judgment (DE 36).  The Plaintiffs' proposed order on the Motion for Default was sent via email to this Court's e-filing address, and was copied to an email address associated with Defendant Daniel Harrison.  The following day, Harrison sent an email reply to the Court's e-filing address, requesting that the court "disregard" the Motion for Default, and indicating that entry of final default judgment "won't be necessary as I am preparing my official response to the case."  On May 24, 2018, Harrison sent another email to the Court's e-filing address with an attachment in PDF format which was titled "Answer." Harrison subsequently called this court's chambers requesting to speak with me personally.

On June 7, 2018, I entered an Order to Show Cause and Instructions to Pro Se Litigant (DE 37), advising that litigants are not permitted to contact the Court directly.  My order included specific instructions as to how defendant Harrison could go about filing pleadings with the court if he is proceeding *pro se.*  My order also advised that defendants Monkey Capital LLC and Monkey Capital Inc. are corporate entities alleged to be wholly owned and operated by Harrison, and that these business entities *could not* appear without counsel in this matter.  I

ordered Monkey Capital LLC and Monkey Capital Inc. to secure counsel on or before June 15, 2018, and warned that failure to comply may result in default judgment being entered against them.  The Defendants did not comply.[1]

Also in the Order to Show Cause entered on June 7th, I ordered Harrison to file a notice on or before June 15, 2018, confirming that it is his intention to proceed pro se in this matter, and if so to include in the notice his current physical address.  I further ordered him to refrain from contacting my chambers directly.  On June 10, 2018, Harrison responded with an email to the court's e-filing address, accusing the court of racism, corruption and harassment.  Then, on June 13, 2018, Harrison filed a *pro se* pleading which appears to be both an Answer to the allegations and also a Motion to Dismiss the Amended Complaint.  (DE 41).  Defendant Harrison did not comply with the instructions in the Order to Show Cause requiring him to file a notice in the record which sets forth his physical mailing address, and no address is listed in his Answer/Motion.

Neither the Monkey Capital Defendants nor Daniel Harrison have responded to Plaintiffs' Motion for Entry of Final Default Judgment.

**B.  Plaintiffs' Factual Allegations**

The Amended Complaint contains the following factual allegations:   All of the named Plaintiffs invested in Monkey Capital between July and November of 2017.   (Amended Complaint at ¶¶ 15-21).   Defendant Monkey Capital, LLC is a Delaware limited liability company controlled by its founder, Daniel Harrison, who created the entity in approximately

---

[1] This is the second time Defendant Monkey Capital LLC was ordered to retain counsel.  That entity was originally represented in this matter, but I granted counsel's motion to withdraw on February 22, 2018 (DE 24).  At that time, I entered an order requiring Monkey Capital LLC to secure new counsel within 20 days and it failed to do so.

late-July 2017 as a "new parent company to hold [all] interest in the [investment] entity." (*Id*. at ¶ 22). Defendant Monkey Capital, Inc. is a foreign for-profit corporation which lists its principal place of business in Singapore. Monkey Capital, Inc. is also controlled by its founder, Defendant Harrison. (*Id*. at ¶ 23). Harrison is an individual domiciled in London, England. (*Id*. at ¶ 24). *See also*, DE 19 (sworn Waiver of Service of Summons, executed by Daniel Mark Harrison, representing that his current address is "London, U.K."). Monkey Capital LLC and Monkey Capital, Inc. are wholly owned, operated, and controlled by Harrison. The companies are alleged to be pass-through entities from which Harrison takes all profits. Harrison is alleged to have formed the Monkey Capital entities for fraudulent purposes as a tool to undertake the investment scheme and unregistered sale of securities he enacted upon all Monkey Capital investors, including Plaintiffs. (Amended Complaint at ¶25).

Defendants and Harrison spent months in 2017 promoting interest in their purported development of a unified network of news and data distribution with respect to virtual capital assets, as well as a private cryptocurrency exchange and decentralized hedge fund (the "Monkey Capital Market"), which was not fully developed or functional at the time Plaintiffs each made their investments. (*Id*. at ¶ 2). According to a website created and managed by Monkey Capital (https://corporate.m0nk3y.com), Daniel Harrison -- in or around December 2014 -- developed the concepts underlying the Monkey Capital Market, which he later expressed through publications in July 2017. (*Id*. at ¶ 33).

As Monkey Capital promoted to investors, Monkey Capital's promise was to develop the Monkey Capital Market: a unique, inter-connected network of cryptocurrency news and information; a platform on which cryptocurrency could be exchanged for other cryptocurrency or fiat currency (without prioritizing its own proprietary cryptocurrency); and communication

channels through which users could widely disseminate information relevant to them and their investments in the cryptocurrency world.  (*Id*. at ¶ 34).

Moreover, Monkey Capital promoted that through its "all-star management team" (Chief Executive Officer Daniel Harrison, Chief Operating Officer Joshua Hawley, and Group Financial Director Stefan Hickmott) it would be operating a decentralized hedge fund to invest in items such as SpaceX supply contracts and hostile public company takeovers and Blockchain systems while simultaneously speculating on large blocks of cryptocurrency. As represented by Monkey Capital, the management team's "diverse backgrounds and experience in the funding and acquisition industry bolsters the Company's ability to select seed and early stage businesses with the greatest likelihood of potential success for the Company to invest."  (*Id*. at ¶ 35).

To invest Monkey Capital "at a valuation premium" before the ICO and get in on the ground floor of the Monkey Capital Market before it launched, investors were solicited to transfer cryptocurrency (*e.g.*, bitcoin or Ether) to Monkey Capital, in exchange for which the investors would be given cryptocurrency options created by Defendants called Coeval, which were made available to the investors on a cryptocurrency trading platform called the Waves Decentralized Exchange (the "Waves DEX").  (*Id*. at ¶ 36).  For each investment in Monkey Capital prior to the ICO and the launch of the Monkey Capital Market, the investor would be given cryptocurrency options called a Coeval ("COE") which were newly-created by Defendants, and which the investor, upon the ICO taking place, could exchange for a to-be-created cryptocurrency called Monkey Coin ("MNY") that Defendants purported would skyrocket in demand and value once the Monkey Capital Market was launched.  (*Id*. at ¶ 3).

Defendants represented to investors that each Coeval token entitled the holder to 10,000 Monkey Coins when the Monkey Capital ICO were to take place.  (*Id*. at ¶ 37).  As represented

by Defendants, the Coeval held great intrinsic value and investors were wise to invest before the ICO because the value of Coeval and the value of the to-be-issued Monkey Coins would rise exponentially once the Monkey Capital Market got launched.  (*Id*. at ¶ 38).  Coeval and Monkey Coins allegedly derive their value from the usefulness and popularity of the Monkey Capital Market -- development and launch of which was entirely in Defendants' control.  (*Id*. at ¶ 4).  As of the date of this Order, the Monkey Capital Market is purportedly still being developed and might never be launched.  (*Id*. at ¶ 7).

The Monkey Capital investors invested in a common enterprise and with an expectation that the increased value of their Coeval and to-be-issued Monkey Coins would produce a substantial return on their investment that would be derived solely from the efforts of others -- namely, Defendants.  (*Id*. at ¶ 8).  Under the Plaintiffs' theory, the thing for which Plaintiffs invested their assets looked like a security, functioned like a security, and fit the definition of a security.  Plaintiffs assert that securities regulators and courts look beyond the form or label someone appends to his/her/its activity and instead consider the actual substance and purpose of the activity.  *Id*. at ¶ 9.  *See also*, *SEC v. Kirkland*, 521 F.Supp.2d 1281, 1288 (M.D. Fla. 2007) ("Congress intentionally defined the term 'security' in sufficiently broad and general terms so as to include within the definition the many types of instruments that in our commercial world fall within the ordinary concepts of a security. . . . Courts are therefore called upon to look at the substance and economic realit[ies] of the underlying transaction rather than its label or form.") (internal quotation marks omitted).  Plaintiffs contend that notwithstanding Defendants' attempts to avoid governmental and private scrutiny, it is clear that the financiers were indeed profit-seeking investors in a security and that Defendants promoted and conducted an unregistered offering of securities.  (*Id*. at ¶ 10).

The Monkey Capital ICO did not occur as scheduled (or at all); and at or about the time the ICO was supposed to have taken place, Monkey Capital's fundraising website disappeared. (*Id*. at ¶¶ 50-51).  The secure address on the Waves DEX to which investors sent their investment assets was not a Monkey Capital wallet from which investors would be allocated their appropriate number of Coeval or Monkey Coins; instead, Plaintiff's allege that the wallet was a wallet owned and controlled by Defendant Daniel Harrison personally.  (*Id*. at ¶ 52).

Eight Hundred Million (800,000,000) of the Monkey Coins were alleged to have been issued to Daniel Harrison, who converted them into other cryptocurrency and fiat currency -- a combination Plaintiffs' believed to be valued in early-2018 at approximately $30,000,000.00. (*Id*. at ¶ 48).  Plaintiffs aver that Defendants and Harrison have already pocketed for themselves large sums of money for their promotional efforts, and -- due to the many misrepresentations, factual omissions, and unlawful activities engaged in by Defendants -- it appears Plaintiffs will not, and potentially cannot, see any return on their investments.  (*Id*. at ¶ 11).  Defendants have converted the cryptocurrency Plaintiffs have deposited with Defendants as investment funds, Defendants have taken for themselves the value of those investments and have entirely devalued the self-created cryptocurrency they provided Plaintiffs in exchange, and Defendants are now manipulating the very market they created by seeking to extort further assets from Plaintiffs.  (*Id*. at ¶ 59).

## II.     LEGAL STANDARD

"Federal Rule of Civil Procedure 55(b) provides that this Court may enter a Judgment By Default when a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend against an action."  *Energy Source, Inc. v. Gleeko Properties, LLC*, No. 10-21162-CIV, 2012 WL 13008451, at *4 (S.D. Fla. Dec. 12, 2012).  "The effect of a default

judgment is that the defendant . . . admits the plaintiff's well-pleaded allegations of fact, is concluded on those facts by the judgment, and is barred from contesting on appeal the facts thus established." *Buchanan v. Bowman*, 820 F.2d 359, 361 (11th Cir. 1987) (internal quotations and citations omitted).  *See also Grant v. Pottinger-Gibson*, 725 Fed. Appx. 772, 774 (11th Cir. 2018) ("a defaulting defendant admits the plaintiff's well-pleaded allegations of fact") (internal quotations omitted).

"If the facts in the complaint are sufficient to establish liability, then the court must conduct an inquiry to ascertain the amount of damages."  *PetMed Express, Inc. v. MedPets.Com, Inc.*, 336 F. Supp. 2d 1213, 1217 (S.D. Fla. 2004).  Notwithstanding Rule 55's permissive language, longstanding Eleventh Circuit precedent holds that judgment of default "awarding cash damages [cannot] properly be entered without a hearing unless the amount claimed is a liquidated sum or one capable of mathematical calculation."  *Adolph Coors Co. v. Movement Against Racism & the Klan*, 777 F.2d 1538, 1543 (11th Cir. 1985).

## III.    DISCUSSION

Plaintiff's well-pleaded facts, taken as true, establish that Plaintiffs are entitled to final default judgment in their favor and against Defendants Monkey Capital LLC and Monkey Capital Inc. on the claims set forth in the Amended Complaint.  I note that the legal conclusions reached in this order pertain to legal theories that are somewhat novel.  Because this order arises within the context of a default judgment, my conclusions are necessarily based upon Plaintiffs' one-sided submissions to the Court, without the benefit of any adversarial process.  I have reviewed the record as a whole, including the pleadings and sworn declarations submitted on behalf of Plaintiffs. (DE 8-1 (Andrew Hodges); DE 8-2 (Vladimir Cood); DE 8-3 (Gautam

Desai); DE 8-4 (Shammi Nabukumar); DE 10-1 (Jody Powell); and DE 36-1 (Anthony Sajewicz)).

**A.  *Violation of Section 12(a) of the Securities Act of 1933 (Count I)***

Section 12(a)(1) [15 U.S.C. §§77*l*(a)(1)] grants Plaintiffs a private right of action against any person who offers or sells a security in violation of Section 5 [15 U.S.C. § 77e], and states that such person "shall be liable. . . to the person purchasing such security from him, who may sue either at law or in equity in any court of competent jurisdiction, to recover the consideration for such security with interest thereon, less the amount of any income received thereon, upon the tender of such security, or for damages if he no longer owns the security."

To prevail on a Section 5 claim, a plaintiff must establish the following elements: "(1) absence of an effective registration statement covering the securities in question; (2) the offer or sale of the securities; and (3) the use of the mails, or any means or instruments of transportation or communication in interstate commerce in connection with the sale or offer."  *Scheck Invs., L.P. v. Kensington Mgmt., Inc.*, 2009 WL 10668565, *4 (S.D. Fla. June 17, 2009) (citing *SEC v. Unique Fin. Concepts, Inc.*, 119 F.Supp.2d 1332, 1339 (S.D. Fla. 1998).  The definition of a "security" under the Securities Act includes "investment contract(s)."   "An offering is an investment contract if there is: (1) an investment of money, (2) in a common enterprise, (3) with the expectation of profits to come solely from the efforts of others."  *Tippens v. Round Island Plantation LLC*, 2009 WL 2365347, at *9 (S.D. Fla. July 31, 2009) (citing *SEC v. Unique Fin. Concepts, Inc.*, 196 F. 3d 1195, 1199 (11th Cir. 1999).  *See also*, *SEC v. W.J. Howey Co*., 328 U.S. 293, 298-301 (1946) ("*Howey*").

Defendants, by engaging in the conduct alleged in the Amended Complaint, directly or indirectly made use of means or instruments of transportation or communication in interstate

commerce or of the mails to offer to sell or to actually sell securities, or to carry or cause such securities to be carried through the mails or in interstate commerce for the purpose of sale or for delivery after sale.  *See*, *e.g.*, *SEC v. Levin*, 2013 WL 594736, at *12 (S.D. Fla. Feb. 14, 2013) ("[T]he internet, which necessarily includes email, is an 'instrumentality of interstate commerce.'") (quoting *United States v. Hornaday*, 392 F.3d 1306, 1311 (11th Cir. 2004)). Defendants are "sellers" within the meaning of the Securities Act because they or their agents solicited Plaintiffs' investments in the aborted Monkey Capital ICO.

**Investment of Money:** The "investment of money" required for an "investment contract" need not be made in cash and refers more generally to "an arrangement whereby an investor commits assets to an enterprise or venture in such a manner as to subject himself to financial losses."  *SEC v. Friendly*, 49 F. Supp. 2d 1363, 1368-69 (S.D. Fla. 1999).  *See also Uselton v. Comm. Lovelace Motor Freight, Inc.*, 940 F.2d 564, 574 (10th Cir. 1991).  The terms of the Monkey Capital ICO called for an investment of cryptocurrency or fiat currency by Plaintiffs. Plaintiffs' investment of assets, in the form of Ether and/or Bitcoin, satisfies the "investment of money" prong for an investment contract.

**Common Enterprise:**  "[A] common enterprise exists where the 'fortunes of the investor are interwoven with and dependent upon the efforts and success of those seeking the investment of third parties."  *SEC v. Unique*, 196 F.3d at 1199 (citing *Villeneuve v. Advanced Bus. Concepts Corp.*, 698 F. 2d 1121, 1124 (11th Cir. 1990)).  "The thrust of the common enterprise element test is that the investors have no desire to perform the chores necessary for a return, and are attracted to the investment solely by the prospects of a return."  *Eberhardt v. Waters*, 901 F. 2d 1578, 1580-81 (11th Cir. 1990).  The funds paid by Plaintiffs pursuant to the Monkey Capital ICO were pooled by Defendants in an effort by Defendants to secure a profit for themselves and

the investors.  As a result, the investors, including Plaintiffs, shared in the risks and benefits of the investment.

**Expectation of Profits from the Efforts of Others:**   Plaintiffs relied on, and were dependent upon, the expertise and efforts of Defendants for their investment returns.  Plaintiffs expected that they would receive profits from their investments in Defendants' efforts.  The fortunes of individual investors in the Monkey Capital ICO were directly tied to the failure or success of the products the Defendants purported to develop, and no individual investor could exert control over the success or failure of his or her investment.  The third prong of the *Howey* test is satisfied when "the efforts made by those other than the investor are the undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise."  *Bamert v. Pulte Home Corp*., 445 Fed. App'x 256, 262 (11th Cir. 2011) (quoting *Williamson v. Tucker*, 645 F.2d 404, 418 (11th Cir. 1981)); *see also*, *SEC v. Merchant Capital, LLC*, 483 F.3d 747, 755 (11th Cir. 2007) ("the focus is on the dependence of the investor on the entrepreneurial or managerial skills of a promoter or other party") (quoting *Gordon v. Terry*, 684 F.2d 736, 741 (11th Cir. 1982)).

"Although *Howey* stated that the expectation of profits must come solely from the efforts of others, many courts, including the Eleventh Circuit, have rejected a literal or strict interpretation and have instead interpreted 'solely' to mean substantially or primarily.  The Supreme Court has removed the emphasis from the word 'solely' and held that the touchstone of the test is an investment in a common venture premised on a reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others."  *Tippens*, 2009 WL 2365347, at *9 n. 9 (quotations and citations omitted).  Because the success of Monkey Capital and the Monkey

Capital Market that Defendants purported to develop was entirely dependent on the efforts and actions of the Defendants, the third prong is satisfied.

Coeval and Monkey Coins constitute investment contracts and are therefore subject to federal securities laws, including the registration requirements promulgated thereunder.  No registration statements have been filed with the SEC or have been in effect with respect to any of the offerings described in the complaint.  Therefore the allegations are sufficient to find that Defendants participated in the offer and sale of unregistered securities in violation of the Securities Act.  As a direct and proximate result of Defendants' unregistered sale of securities, Plaintiffs have suffered damages in connection with their respective purchases of Coeval and Monkey Coin securities in the Monkey Capital ICO.

### B.  *Rescission of Contract (Count III)*

"In order to state a claim for rescission, Plaintiffs must plead facts demonstrating the following: (1) the parties' relationship or character; (2) the making of a contract; (3) fraud, mistake, false representations, impossibility of performance, or other grounds for rescission; (4) that the party seeking rescission actually rescinded the contract and notified the other party accordingly; (5) if the moving party received benefits from the contract, Plaintiffs must allege that they attempted to restore those benefits to the party furnishing them; and (6) there is no adequate remedy at law for the moving party."  *Beaver v. Inkmart LLC*, 2012 WL 3822264, *5 (S.D. Fla. Sept. 4, 2012).

The terms of the scheduled Monkey Capital ICO constitute a contract between Plaintiffs and Defendants.  The contract was entered into by and between Defendants and each Plaintiff between July 1, 2017 and October 31, 2017.  The terms of the scheduled Monkey Capital ICO called for an investment of cryptocurrency by Plaintiffs.  The funds paid by Plaintiffs pursuant to

the scheduled Monkey Capital ICO were pooled by Defendants in an effort by Defendants to secure a profit for themselves and the investors.  As a result, the investors, including Plaintiffs, shared in the risks and benefits of the investment.  Plaintiffs relied on, and are dependent upon, the expertise and efforts of Defendants for their investment returns.  The terms of the scheduled Monkey Capital ICO constitute an investment contract and are therefore subject to federal and state securities laws, including the registration requirements promulgated thereunder.  No registration statement was filed or in effect with any federal or state regulatory body, and no exemption from registration exists with respect to the Monkey Capital ICO.  As a result of Defendants' fraud, false representations, and violation of federal and state securities laws in connection with the Monkey Capital ICO, the Contract is subject to rescission and cancellation.

Upon filing the instant lawsuit, Plaintiffs rescinded the contract and notified Defendants accordingly.  To the extent that Plaintiffs received from Defendants any benefits through the contract -- though none are known to them at this time -- Plaintiffs offered to restore to Defendants those benefits when the Complaint in this matter was filed.  As a direct and proximate cause of Defendants' conduct, Plaintiffs have been damaged.

Defendants Monkey Capital, LLC and Monkey Capital Inc. are subject to liability because they solicited and otherwise participated in the sale to Plaintiffs of the misrepresented and unregistered securities.  Moreover, the Defendants are subject to liability because they are believed to control, or to have obtained control over, a large portion of the assets invested by Plaintiffs which must be disgorged and returned to Plaintiffs in effectuating the rescission of the contract into which they were unlawfully led.

### C. *Unregistered Offer and Sale of Securities (Count V)*

"Section 517.07 of the [Florida Securities and Investor Protection Act] provides that '[i]t is

unlawful and a violation of this chapter for any person to sell or offer to sell a security within this state unless the security . . . is registered pursuant to this chapter.' Fla. Stat. § 517.07(1). Accordingly, in order for Plaintiffs to prevail on [this] Count . . . of the Amended Complaint, they must establish that: (1) [the] contracts sold by [Defendants] were securities; (2) these securities were not registered with the State of Florida; and (3) Defendants sold such unregistered securities." *Scheck Invs., L.P.*, 2009 WL 10668565, *2.

The scheduled Monkey Capital ICO called for an investment of money or assets by Plaintiffs -- specifically, the bitcoin, Ether, and other assets of value transferred to Defendants in exchange for the non-functional Coeval and Monkey Coins issued by Defendants.  The funds paid by Plaintiffs were pooled by Defendants in the project in an effort by Defendants to secure a profit for themselves and Plaintiffs.  As a result, Plaintiffs -- as the investors -- shared in the risks and benefits of the investment scheme.  Plaintiffs relied upon, and were dependent upon, the expertise and efforts of Defendants for their investment returns.  Plaintiffs expected that they would receive profits from their investments in Defendants' efforts.

Coeval and Monkey Coins constitute investment contracts and are therefore subject to the Florida Blue Sky Laws, including the registration requirements of Fla. Stat. § 517.07.  No registration statements have been filed with the Florida Office of Financial Regulation or have been in effect with respect to any of the offerings alleged in the complaint.  Similarly, no exemption from registration exists with respect to the Monkey Capital ICO.  Despite neither registering the offerings nor obtaining an exemption from registration, Defendants sold Plaintiffs the Coeval and Monkey Coins in connection with the Monkey Capital ICO.  These facts are sufficient to establish Defendants' violation of Fla. Stat. §§ 517.07, *et seq*., and as a result of

Case 9:17-cv-81370-DMM   Document 44   Entered on FLSD Docket 08/14/2018   Page 15 of 21

Defendants' unregistered sale of securities, Plaintiffs have suffered damages in connection with their respective purchases of Coeval and Monkey Coin securities in the Monkey Capital ICO.

**D.** ***Violation of Florida's Deceptive and Unfair Trade Practices Act Chapter 501, § 211(1) Fla. Stat. ("FDUTPA") (Count VI)***

A cause of action arising under FDUPTA has three elements: "(1) a deceptive act or unfair practice; (2) causation; and (3) actual damages." *Beaver*, 2012 WL 3822264, at *4. *See also Tippens*, 2009 WL 2365347, at *11 (same). Chapter 501, Fla. Stat., Florida's Deceptive and Unfair Trade Practices Act is to be liberally construed to protect the consuming public from those who engage in unfair methods of competition, or unconscionable, deceptive or unfair acts or practices in the conduct of any trade or commerce.

Plaintiffs are "consumers" within the meaning of Fla. Stat. § 501.203(7). By soliciting investor funds in the manner in which they did, Defendants engaged in "trade and commerce" within the meaning of Fla. Stat. §501.203(8). While FDUTPA does not define "deceptive" and "unfair," it incorporates by reference the Federal Trade Commission's interpretations of these terms. "[D]eception occurs if there is a representation, omission, or practice that is likely to mislead the consumer acting reasonably in the circumstances, to the consumer's detriment." *Lombardo v. Johnson & Johnson Consumer Companies, Inc.*, 124 F. Supp. 3d 1283, 1287 (S.D. Fla. 2015) (internal quotation marks and citation omitted). Federal courts have defined a "deceptive trade practice" as any act or practice that has the tendency or capacity to deceive consumers. *Fed. Trade Comm'n v. Partners In Health Care Ass'n, Inc.*, 189 F. Supp. 3d 1356, 1367 (S.D. Fla. 2016). Courts have defined an "unfair trade practice" as any act or practice that "offends established public policy and one that is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers." *Kenneth F. Hackett & Assocs., Inc. v. GE Capital Info.*

*Tech. Sols., Inc.*, 744 F. Supp. 2d 1305, 1312 (S.D. Fla. 2010).  Moreover, as the securities laws are designed for consumer protection and proscribe unfair methods of competition, or unfair, deceptive, or unconscionable acts or practices, a violation of the securities laws is a *per se* violation of FDUTPA.  *See, e.g., Alvarez v. Bank of Am. Corp.*, 2014 WL 3767669, at *2 (S.D. Fla. July 31, 2014).

Defendants' acts and omissions represented to Plaintiffs that, among other things: (1) Monkey Capital was developing a news, information, and trading network -- along with a decentralized hedge fund -- in which investors could place their funds for profit; (2) Plaintiffs' cryptocurrency was being used to build out the Monkey Capital Network; (3) the Monkey Capital Network would be fully functional shortly after the ICO; (4) Monkey Capital would timely issue to investors their proportional Monkey Coin holdings shortly after the ICO. Defendants were on notice at all relevant times that the false representations of material facts described above were being communicated to prospective investors (such as Plaintiffs) by their authorized agents.  This conduct constitutes both deceptive and unfair trade practices because the false representations and omissions made by Defendants have a tendency or capacity to deceive consumers, such as Plaintiffs, into investing in Monkey Capital's falsely-touted business and are unethical, oppressive, unscrupulous, or substantially injurious to consumers.

As a result of Defendants' deceptive trade practices, Plaintiffs were deceived into investing their cryptocurrency and/or fiat currency with a company that functioned solely as an engine of fraud, thereby causing economic damage to Plaintiffs.  The materially false statements and omissions as described above, and the fact that this was a misleading investment, were unfair and deceptive practices perpetrated on Plaintiffs which would have likely deceived a reasonable person under the circumstances. As a result of the false representations and violations of the

securities laws described above, Plaintiffs have been damaged by, among other things losing their invested cryptocurrency.

**E.  *Fraudulent Inducement (Count VII)***

Under Florida law, the elements of fraudulent inducement are: (1) misrepresentation of a material fact, (2) by someone who knew or should have known of the statement's falsity, (3) with intent that the representation would induce another to rely and act on it, and (4) injury suffered in justifiable reliance on the representation.  *Levenger Co. v. Feldman*, 516 F. Supp. 2d 1272, 1290 (S.D. Fla. 2007).

Daniel Harrison -- on behalf of himself and the Monkey Capital Defendants -- by acts of both omission and commission, made false statements to Plaintiffs concerning material facts about their investments in Monkey Capital. Specifically, Defendants' representations to Plaintiffs that, among other things: (1) Monkey Capital was developing a news, information, and trading network -- along with a decentralized hedge fund -- in which investors could place their funds for profit; (2)  Plaintiffs' cryptocurrency was being used to build out the Monkey Capital Network; (3) the Monkey Capital Network would be fully functional shortly after the ICO; (d) Monkey Capital would timely issue to investors their proportional Monkey Coin holdings shortly after the ICO.; were false; and Defendants knew at the time that the statements were false.

Defendants intended that Plaintiffs would be induced into action by relying upon the statements of fact made to them by and on behalf of Defendants.  In the course of investing their money with Defendants and entrusting Defendants to develop the Monkey Capital Network and timely issue to them their proportional Monkey Coin holdings, Plaintiffs reasonably and justifiably relied on the statements of fact made to them by and on behalf of Defendants.  As a

direct and proximate result of Plaintiffs' reliance on the statements made to them by Defendants, Plaintiffs have suffered damage.

**F.  *Conversion (Count VIII)***

"[C]onversion is an unauthorized act which deprives another of his property permanently or for an indefinite time."  *Nat'l Union Fire Ins. Co. of Pennsylvania v. Carib Aviation, Inc.*, 759 F.2d 873, 878 (11th Cir. 1985) (internal quotations and citations omitted).  Under Florida law, the claimant must further "establish possession or an immediate right to possession of the converted property at the time of the conversion."  *United States v. Bailey*, 419 F. 3d 1208, 1212 (11th Cir. 2005). "The generally accepted rule is that demand and refusal are unnecessary where the act complained of amounts to a conversion regardless of whether a demand is made."  *IberiaBank v. Coconut 41, LLC*, 984 F. Supp. 2d 1283, 1308 (M.D. Fla. 2013) (internal quotations and citation omitted).  "But while a demand and refusal constitute evidence that a conversion has occurred, it is unnecessary to prove a demand and refusal where the conversion can be otherwise shown."  *Id.*

Plaintiffs transferred to Defendants valuable cryptocurrency for investment.  Defendants have kept Plaintiffs' cryptocurrency (including all profits and all "forked"/newly-created cryptocurrency related thereto) after Plaintiffs requested its return, despite Defendants' lack of any ownership interest in the money.  By refusing to return to Plaintiffs their cryptocurrency (including all profits and all "forked"/newly-created cryptocurrency to which Plaintiffs are entitled), Defendants intended to interfere with, and did interfere with, Plaintiffs' ownership in, interest in, and right to possess the cryptocurrency and have permanently deprived Plaintiffs of their property.  Defendants have utilized Plaintiffs' cryptocurrency to cover Defendants' own

business expenses and enrich themselves.  As a result of Defendants' conversion of Plaintiffs' cryptocurrency to their own corporate and personal use, Plaintiffs have suffered damage.

## IV.    CONCLUSION

For the above-stated reasons, it is **ORDERED AND ADJUDGED** that:

1.      Plaintiffs' Motion for Entry of Final Default Judgment (DE 36) is **GRANTED IN PART AND DENIED IN PART**.

2.      Final Default Judgment is **GRANTED** and judgment is hereby **ENTERED** in favor of Plaintiffs and **against Defendants Monkey Capital LLC and Monkey Capital, Inc.** as to the claims set forth in the Amended Complaint against Defendants Monkey Capital LLC and Monkey Capital, Inc.

3.      Final Default Judgment is **DENIED as to Defendant Daniel Harrison**.

4.      I decline to enter an award of cash damages in this matter without a hearing to determine the appropriate manner of calculating the value of Plaintiffs' investments.  A hearing is therefore scheduled for **Friday, August 24, 2018 at 2:00 p.m.,** at which time, Plaintiffs' may offer evidence and argument with respect to their assertion that Defendants are jointly and severally indebted to Plaintiffs in the following principal sums which have been proposed by Plaintiffs:

| Name of Plaintiff | Cryptocurrency Wrongfully Taken by Defendants | Present Value of Cryptocurrency Wrongfully Taken by Defendants ($USD)[2] |
|---|---|---|
| Andrew Hodges | 50.003 bitcoin | $313,613.00 |
| Vladimir Cood | 30 bitcoin | $188,157.00 |
| Gautam Desai | 9.64 bitcoin<br>109,101.99 Waves coins<br>5,105.67 MobileGo coins | $60,461.02<br>$289,241.00<br>$933.78<br>Total: $ 350,635.80 |
| Jody Powell | 8.2 bitcoin | $52,429.50 |
| Shammi Nabukumar | 10 bitcoin | $62,718.90 |
| Anthony Sajewicz | 27.6 bitcoin<br>48 Ether<br>3,000 Waves coins | $173,104.00<br>$21,101.42<br>$7,953.33<br>Total: $202,158.75 |
| **TOTAL PRINCIPAL SUM** | | **$ 1,169,712.95** |

**DONE AND ORDERED** in Chambers at West Palm Beach, Palm Beach County, Florida, this 14th day of August, 2018.

_____
DONALD M. MIDDLEBROOKS
UNITED STATES DISTRICT JUDGE

---

[2] Plaintiffs' valuations were taken on July 13, 2018 from www.CoinMarketCap.com, which takes the volume weighted average of all prices reported at several dozen cryptocurrency markets serving investors in the United States and abroad.  On July 13, 2018, CoinMarketCap estimated the weighted value of each bitcoin at $6,271.89, each Ether at $439.61, each Waves coin at $2.65, and each MobileGo coin at $0.182891.

Copies to:

David C. Silver, Esq. and Jason S. Miller, Esq.
  SILVER MILLER, 11780 W. Sample Road, Coral Springs, FL 33065
   *Counsel for Plaintiffs*

MONKEY CAPITAL, LLC
  c/o Harvard Business Services, Inc., 16192 Coastal Highway, Lewes, DE 19958
  E-mail: dmh1980@protonmail.com

MONKEY CAPITAL, INC.
  c/o Daniel Harrison, 9 Temasek Boulevard, Suntec Tower Two - 31st Floor, Singapore 038989
  E-mail: dmh1980@protonmail.com

DANIEL HARRISON
  London, United Kingdom
  E-mail: dmh1980@protonmail.com