UNITED STATESDISTRICT COURT SOUTHERN DISTRICT OF FLORIDA
Case No. 17-81370-cv-MIDDLEBR0OKS/Brannon

ANDREW HODGES, individually,
VLADIMIR COOD, individually;
GAUTAM DESAI, individually;
JODY POWELL, individually;
JEFFREY HEBERLING (deceased), individually;
SHAMMI NABUKUMAR, individually;
ANTHONY SAJEWICZ, individually;



FILED BY___ РbC ___ D.C.

JAN 22 2019

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S.D. OF FLA. – W.P.B.

PLAINTIFFS,

vs.

MONKEY CAPITAL, LLC, a Delaware limited liability company;
MONKEY CAPITAL, INC., a foreign corporation;
DANIEL HARRISON, an individual;

DEFENDANTS.

_____/

## MOTION TO OPPOSE SUMMARY & TO ORDER PLAINTIFFS TO PROVIDE FULL DISCLOSURE OF PARTIES, RELATIONSHIPS & TRANSCRIPTS

### Background

1. In about the summer of 2015 DEFENDANT received a call from Tetsuya Ishikawa, an old friend from Oxford University, explaining that his friend was involved with a firm called DS7 that owned a property development portfolio wherein the current development team, Absolute Living Developments, was being non-responsive in communicating with DS7 who owned the freehold for the developments. Ishikawa asked DEFENDANT if he would be interested to sell some of the properties to expat investors in Asia and with the money DS7 could continue development on the sites which had been temporarily halted as sales had come to a standstill. Before long, DEFENDANT was considering a plan to be able to settle the liabilities of ALD via generating sales along with the present ALD management and then assuming control of the company liability-free. This proposal however was rejected by the ALD management George Leong who DEFENDANT flew up to Kuala Lumpur from Singapore to visit.

2. Leong threatened DEFENDANT that unless he purchased the company with the liabilities in tact and paid 100,000 pounds for the company then DEFENDANT would suffer as a result. DEFENDANT resigned as a director of ALD, which DS7 had

2

appointed him to the role of, unable to get any further clarity on the company's financial statement and being threatened by the co-Director. In all, DEFENDANT was a director of ALD less than 3 months. The gambit to become a director was mainly DEFENDANT's idea although it was carried out by DS7 as they had access to the Companies House online area. DEFENDANT thought that if he was a director of the company and issued a press release announcing a premature purchase (intended purchase) of the company then he would be able to get more clarity on the company's financials and to potentially stimulate constructive discussion with Leong. This turned out to be a naïve idea in retrospect.

3.  During the course of the subsequent 6 months from about March 2016 until August 2016 DEFENDANT did retrospectively manage to get close to a number of the ALD investors and courted them for investment in his own company, an investment holding company called DMH&CO which he was at that point in time repositioning from a property development company (since the intention was to acquire ALD but that did not succeed) into a multi-industry investment holding company. About 13 investors committed a little over a million dollars US.

4.  The investment money was used to fund five deals: the first one was a purchase of Highway Capital shares and options and this went ahead with DEFENDANT still owning to the present day 3.5m HWC LSE-listed options and 1m shares; the second was an investment in All Asset Asia Capital, an AIM company, and the deal fell through at the 11th hour but ran up costs; the third was an investment in Bay Filey which also feel through but ran up significant due dilligence costs and travel costs as a result of requiring a trip to Yorkshire from Asia and other expenses; the fourth was an investment in DX Markets, a Blockchain company that partially went through with the investment of around 50,000 pounds of the agreed 250,000 pounds made and the fifth investment was in Monkey Capital, a DX Markets and DMH&CO-owned joint venture company that was planned to undertake an ICO. With respect to the latter investment, had such investment been able to proliferate naturally in the view of DEFENDANT it would inevitably have meant that DMH&CO was today a liquid company which is presently not the case.

5.  On July 1, 2017, DEFENDANT announced a planned ICO of Monkey Capital token called MNY which would be undertaken on Waves decentralised Exchange platform and then created with an ERC20 "swap". Such swaps are very commonplace in the case of Blockchain decentralised currencies.

6.  Monkey (MNY) was the currency that was to be used to power the Monkey network.

7.  The Monkey network was different to most blockchain builds; it was planned to be a decentralised value-configured smart contract based network not unlike that of Bancor (indeed the equations that are used in the smart contracts for Monkey are very similar to those used in the Bancor protocol)

8. MNY was the "high supply" currency and COE was the "low supply" currency

9. DEFENDANT was successful in attracting a market to both MNY and COE that was robust and popular

10. On July 27 the SEC issued guidelines that ICOs may be considered securities: this announcement put pressure on DEFENDANT to rethink the approach of issuing Monkey tokens in such a way that might be considered securities

11. DEFENDANT chose to initially sell half the Monkey tokens into the market to establish an equilibrium value between Coeval and Monkey. This equilibrium value was priced between 13,000 and 20,000 MNY / COE on an intrinsic 10,000 MNY / COE reflecting the balance of supply difference between MNY / COE. When the equilibrium held around the 10,000 MNY / COE mark DEFENDANT sold more Monkey tokens

12. A defaming blog post was published by a gold site news proprietor named Peter Spina in which Spina falsely accused DEFENDANT of "dumping" the MNY tokens into the market in the same way and language that the lawsuit brought against DEFENDANT in late 2017 (see below) uses to describe such sales despite that DEFENDANT advised all holders throughout the course of the MNY sales that he was selling MNY

13. There are a number of peculiarities with respect to the authenticity and veracity of the Peter Spina profile and blog post. For one, the podcast show's host Chris Waltzig initially invited DEFENDANT on the show around 7 days after the ICO promotion period began. He billed the interview "the most important interview we have had on this show in 16 years." There were a number of subsequent claims the show had been running since 2001 but nowhere on the site goldseek.com is there any indication that there is a 16-year show present. Usually such shows are only too eager to show off their historical legacy. Similarly, the website's proprietor had one news story at the time published about him and that was it. This was in the Denver Post, a regional US daily. 19 months later and there were many more videos concerning Peter Spina online all made by the same PR agency Cambridge House.

14. On the 9th August after it was apparent the ICO would not go ahead Peter Spina published a blog post alleging that DEFENDANT was a "scam" and encouraging investors to sell *en masse*. A number of individuals all claimed to come via the site Goldseek. All of the individuals who claimed to come via this website and no one else ultimately ended up as a plaintiff in the lawsuit vs. DEFENDANT. The implication is clear: the Golldseek website and its owner, plus the Plaintiffs in the class action, were all orchestrated / originated via the same source.

15. The proceeds of MNY sales were received in Bitcoin and in Waves tokens. As most of these sales were effected on Waves DEX which does not have efficient or reliable

record keeping evidence is opaque and unreliable. However DEFENDANT has more reliable records of purchases made with BTC of MNY.

16. DEFENDANT was forced by the Spina attack to reconsidering the strategic approach he had towards rolling out the currency system

17. On Aug 31 Silver Miller Law formed their litigation company. The reason this is significant is that there were discussions vis-a-vis lawsuit as early as late July and early August. This combined with the attack by Spina on DEFENDANT appears premeditated:



Brice @CoCudi85 · 12 Aug 2017

Replying to @dmhco

If you invested join this slack channel monkeycapitalponzi.slack.com /join/shared_in...
Hopefully we can get a class action lawsuit going against this guy

♡ 5

Brice @CoCudi85 · 12 Aug 2017

Replying to @flyMKR @dmhco

It is a fraud, I invested into this too.  @dmhco has already sold all his CoEval at higher prices.  I hope a class action lawsuit is next

18. One week after Silver Miller formed their legal company MNY was delisted from CoinMarketCap. CMC was asked why this was and has been asked since and they have not given a response. This adversely affected trading as CMC acts in essence like a billboard for digital currencies

19. Without representation on CMC and with continuous attacks increasing daily DEFENDANT was in a very difficult position. He was advised privately to close down the operation but felt morally compelled to continue. A decision was taken to keep issuing tokens over the course of the next 4 months in order to stimulate volumes

20. In many instances DEFENDANT *gave away* tokens to traders willing to create market volume. The intention was not to raise capital (which is why it was reasonable to cancel the ICO) but rather to stimulate volumes which is the life blood of all currency exchange markets

21. The additional activity did help stimulate volumes up until December when this lawsuit was filed. At that point volumes were killed instantly.

22. DEFENDANT went ahead with a token swap which was successfully completed

23. The overall plan however had been adversely affected by external market events especially including this lawsuit that it was no longer operable. The plan had been for MNY and COE to act as high utility and low utility tokens in a series of smart contract enabled swaps transactions wherein a "fee" would be extracted continually in the form of MNY and COE. This fee income would allow DEFENDANT to invest in several lucrative investment contracts such as Space X supply contract via a partner, to recapitalise a U.K. public company Highway Capital and a series of other developments all proposed in the original White Paper

24. Income generated from the investments would enable DEFENDANT to continually develop the sophistication of the digital currency platform. This was not allowed to form or take shape as a result of the rising destruction of property occurring on a daily basis up until and after the lawsuit was filed.

25. A reporter named Adam Luck approached DEFENDANT with an e-mail in January 2018 enquiring about the lawsuit and the alleged suicide of one of the members of the Monkey Capital community. His name is Adam Luck. Note the mention of the suicide of the PLAINTIFF Jeffrey Heberling, which is a running theme in journalists that contact the DEFENDANT and his colleagues over the last year:

Adam Luck <adam.luck@mailonsunday.co.uk>                    Wed 10 Jan, 11:45   ☆   ↩   ⋮
to me ▾

Dear Mark,

I am a journalist and write for The Mail on Sunday.

We will be publishing a piece this weekend(14) about the class action in the US courts which alleges you are the key figure behind a multi-million dollar cryptocurrency fraud.

1. We wanted to give you the opportunity to respond to the allegations that you coordinated the Monkey Capital fraud and defrauded a series of investors, according to the US District Court, Southern District of Florida, papers we have seen.
2. We were interested to hear about your involvement in Zurcoin. Why should investors trust you and this product in light of these allegations.
3. We were also interested to hear your response to the news that Jeffrey Heberling, who, according to the court papers, was one of your investors in Monkey Capital, had recently committed suicide. Do you feel any culpability or regret please.

I would be most grateful if you could come back to me by Friday(12) close of play(UK time) at the latest please.

Adam Luck
0203 615 1528
07977094971

Disclaimer

This e-mail and any attached files are intended for the named addressee only. It contains information, which may be confidential and legally privileged and also protected by copyright. Unless you are the named addressee (or authorised to receive for the addressee) you may not copy or use it, or disclose it to anyone else. If you received it in error please notify the sender immediately and then delete it from your system. Associated Newspapers Ltd. Registered Office: Northcliffe House, 2 Derry St, Kensington, London, W8 5TT. Registered No 84121 England.

26. It appears from subsequent searches that Adam Luck is the Toronto-based head of digital marketing and media for International Public group of Companies (IPG), a NYSE-listed PR firm. Adam Luck has written promotional stories for clients as well as hit pieces on behand of HMRC (e.g. https://www.dailymail.co.uk/news/article-5713261/Rosamund-Pike-partner-disqualified-company-boss-failing-pay-200-000-tax.html)

27. The reason this is significant is that Louise Brittain the liquidator for ALD, was reprimanded for allegedly forcefully bankrupting a drinks company on behalf of HMRC in what resulted in an order from a Biritsh judge that she could not represent herself as a liquidator without supervision in subsequent cases in the future.

28. Some, such as the MP for Chiselhurst Robert Neil, claimed that the ban did not go far enough and that she must be permanently barred from acting in any capacity as a liquidator as a result of her behaviour, which he considered the sole reason for the bankruptcy of the 30+ year old family firm Abbey Drinks which was in his constituency.

29. The relationship link between Brittain and Luck to HMRC implies a mutual contact at HMRC which is very difficult to obtain clarity and information about as a result of much of the hmrc files being kept secret.

30. Adam Luck published an article in the Times that alleged DEFENDANT had committed fraud that was extremely similar in content, language, style etc. to one he published about Charlie Cunningham in October 2017. The opening graphs of both articles are featured here for illustration:

**DANIEL MARK HARRISON ARTICLE**
*A former public schoolboy has been accused of being the mastermind of a multimillion-pound international cryptocurrency fraud, which netted him $30m and saw one investor commit suicide.*

*Daniel Harrison, who is the son of a senior City financier, is alleged to have lured American investors with an initial coin offering (ICO), used to fund the creation of a cryptocurrency.*

*Harrison, in his late 30s, according to US court papers, was the founder of Monkey Capital LLC, a Delaware company, and Monkey Capital Inc, a Singapore-based company, and used them for "fraudulent purposes". The claims have been made in a civil class action filed in a Florida court. The filing comes amid increasing legal and regulatory concerns about the boom in crypto-currencies.*

7

**ABSOLUTE LIVING DEVELOPMENTS ARTICLE**

*A former public schoolboy has been named as the alleged mastermind behind a multi-million pound property development fraud, according to High Court papers.*

*Charles Cunningham, whose time at Eton overlapped with **Prince William**'s, has been identified in court papers as controlling a series of companies used to defraud Asian investors of millions of pounds by enticing them with UK developments that were never completed.*

*The son of a City financier, Mr Cunningham, whose brother Rupert is friends with some of **Prince Harry**'s inner circle, lives in a large country estate in North Wales with his wife. The couple boast a who's who of society contacts.*

31. The two articles are written less than 3 months apart (10/01/18 for mine and 22/10/17) for the second article. Given that DEFENDANT was involved in Absolute Living Developments (which DEFENDANT discuss in depth here) it is simply incongruous and ridiculous given how close the two articles are in form and vocabulary to think that Adam Luck was not aware that this was the case. In which case, the question becomes why didn't Adam Luck point out DEFENDANT involvement in ALD at the time of the article? Furthermore, what is a public relations professional doing being published in the national press?

32. We can clearly ascertain that Luck is a public relations professional by having a look at his MuckRack profile. Every single article concerns the clear representation of a client. In fact, one article, which is especially concerning given the sensitivity of the issue to the country, concerns the private sale of love letters written by Princess Diana to James Hewitt.

33. The logical conclusion here is that Luck has organised a targeted and destructive digital media campaign against DEFENDANT for the last year which has nearly bankrupted DEFENDANT business to the extent that DEFENDANT have had to take loans from his father for a substantial sum of money while independently fighting a court case in the United States which Luck organised on behalf or Brittain and the OR using the cover of HMRC where expedient unlawfully and using hired and fictional characters and possibly stolen identities.

34. This person is then featured in the UK press. Where does the line between public relations that is nefariously driven by a liquidator of a company in the UK and the impartial representation of the truth begin and end?

35. DEFENDANT most recently heard from Adam Luck as follows: see the article DEFENDANT wrote (including answering every one of his questions) here. DEFENDANT also have written to the Editor of the Mail on Sunday, Ted Verity, and

the Dept. editor of the Times, Emma Tucker, and the press complaints regulator IPSO all to no avail.

36. Another detail strangely correlates the two cases together. At the point when DEFENDANT received the USA lawsuit in December 2017 and he was due to fly to New York to meet with a potential attorney who approached him soliciting representation (which DEFENDANT later found out was illegal under US law) he was arrested before boarding a Virgin Atlantic flight and questioned for his role in fraudulently deceiving an investor in DMH&CO.

37. No charges were brought since DEFENDANT was able to point out that he had offered the investor in question all his money back along with 8% interest for the inconvenience of the holding period subject to the investor singing a settlement agreement but the investor refused to sign such an agreement which would prohibit the investor taking legal and media action against DEFENDANT.



1:32

← Search

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**From: Alan Ma**
**Sent:** Monday, July 25, 2016 3:38 PM
**To:** 'Philip Wong'
**Subject:** ALD in liquidation - creditors hearing

Dear Philip,

My colleague, Mr Daniel Cheung, attended last Thursday's hearing. We have prepared a report and are minded to release it to the buyers. It will be helpful if you release it to your group's buyers.

*Dear Clients,*

*Following yesterday's creditors' meeting, the following occurred:*

- *Louise Brittain of Wilkins Kennedy LLP was appointed by the Official Receiver (OR) as ALD's liquidator following her vote from the 54% majority of creditors (£31.6m proof of debt).*
- *DS7's proof of debt remained at £24.2m. Their preferred choice of Abbey Taylor as liquidator was not selected.*
- *The OR made a resolution to form a Creditors' Committee to provide oversight of the liquidator. Louise will be responsible for determining the voting rights of the members. As I was a proxy for one buyer within the 54% majority debt, I expressed my interest to Louise to become a member.*
- *The OR resolved that Louise cannot determine the voting rights until at least 21 days have lapsed because that is the period when DS7 can appeal to court to object to Louise's appointment.*

38. In the ALD case a lawyer named Alan Ma in HK who subsequently was disbarred for his role in soliciting and facilitating millions of pounds of payments to the Malaysian directors of ALD e-mailed Philip Wong, the then-Chairman of the victims' committee in HK and husband to DEFENDANT's COO Kathlin Liao telling him that in essence, the OR had established an independent watchdog for the insolvency practitioner which would be in effect appointed by the IP herself (Brittain) and allowing for the fact that he had been made the majority appointee by Brittain who he had personally endorsed. This appointment and structure is highly irregular and possibly fraudulent.

39. Further, in November 2018 DEFENDANT was banned as a Director of a UK company on recommendation by the OR despite having submitted substantial evidence of the fact that he had no controlling or management function at ALD. To the extent that he was banned, the OR justified the ban on the basis that DEFENDANT had, at the request and insistence of DS7 at the time, e-mailed the lawyer of an escrow account to release escrow funds to DS7 so that they could make "final payment" on the completion of a building named Olicana House. DEFENDANT was informed the building was complete and the lawyer ought to have assessed this fact prior to release of the funds so this is a strange reason for the ban.

40. The ban was highly publicised in the news media and included mention of his new residential address in Kilburn, where it was heavily promoted at the time in the Kilburn Times.

41. In filing a complaint with IPSO, the Managing editor of the Daily Mail e-mailed DEFENDANT back and did not deny the relationship between Adam luck and IPG:

> Dear Mr Harrison,
> Thank you for your emails to the Editor who has asked ME to respond on his behalf.
> Adam Luck is a reputable freelance journalist who writes for The Mail on Sunday as well as for other publications. He has recently been investigating a story and has sent you some questions in order to check the accuracy of information he has received and to give you an opportunity to comment.
> We have no current plans to publish an article about this matter.
> I am aware that you made a complaint about an article published in The Sunday Times. You may understand that has nothing to do with The Mail on Sunday.
> If you have a specific complaint about Mr Luck's work for The Mail on Sunday, please address it to me.
>
> Regards
> John Wellington
>
> From John Wellington
> Managing Editor, The Mail on Sunday.

42. In a series of communications held between DEFENDANT and Louise Brittain, Brittain was unusually courteous to DEFENDANT:

*[19:15, 1/16/2019] Daniel M. Harrison: Louise - alright look, I've got the evidence as to what's been going on. I think a face to face with Ken and Eric and yourself plus my lawyer ain't a bad idea. I can pull you under deep or we can resolve this amicably to everyone's satisfaction. Fact is I only ever tried to help and your theory was wrong about me. You can't change the truth. Let's meet if you are up for it. — Daniel*
*[20:14, 1/16/2019] Louise Brittain: Dear Mr Harrison. I am of course happy to meet with yourself and your lawyer but I'm afraid you will have to explain the purpose of the meeting clearly and provide an agenda please.  Yours sincerely Louise Brittain*
*[20:27, 1/16/2019] Daniel M. Harrison: Louise - I will have my lawyer contact you tomorrow.*
*[20:39, 1/16/2019] Daniel M. Harrison: Possibly Friday I'll let you know if so*
*[21:55, 1/16/2019] Louise Brittain: Dear Mr Harrison. I'm afraid I am not available on Friday but please ask your lawyer to contact me to arrange a convenient time and date to meet. Yours sincerely Louise Brittain*
*[23:04, 1/16/2019] Daniel M. Harrison: Will do. I'm sure we can sort this out. We are both honest and smart people.*

43. In and of itself it is extremely questionable why such high-powered individuals (the managing editor for Britain's largest-selling paper and the 17th most powerful accountant in the UK) would respond so urgently to the DEFENDANT's communications with courteous but ultimately evasive responses..

44. It is illogical that Brittain and the OR are not more heavily-involved with prosecuting the Malaysian directors or the director of DS7 Andrew Cammillieri, who received a 1 year suspended sentence for fraud related to the case in a private prosecution. The lack of focus on this topic suggests they are pursuing another legal agenda that is in probability weighed here in the Monkey Capital case biased against the DEFENDANT.

45. Let's visually review the information presented in this document. Both Brittain and Luck are related via HMRC involvements: Luck has written pieces that are negative towards non-tx payers (typical HMRC PR) and Brittain forced a company into liquidation despite the company claiming a clean VAT bill of health and despite the company claiming evidence which Brittain supressed and which she was reprimanded for. Both Brittain and Luck are connected via ALD, too, with Brittain even being mentioned in a previous article of Luck's which ran in the Mail. Therefore, on balance it is statistically impossible that Brittain and Luck are coincidentally connected via DEFENDANT.

46. If this is the case, why would Luck seek to hide the connection by not making a fairly dull story about Monkey Capital a bigger story about someone connected to two frauds? Would this not be a better story?

47. It is this hiding of the connection that is significant since it implies that the Monkey Capital lawsuit and situation was set up by Brittain to smear and target DEFENDANT. 'I always find DEFENDANT target's pinch-point well in advance and I push it," Brittain is quoted in one article as saying.It is very concerning that this fraud may be abetted by HMRC personnel.

11

48. Another way of presenting this is to see the connected spheres between Brittain and Luck. HMRC and ALD are both connected as a result of the non-payment of taxes that caused the ALD winding up. ALD and DEFENDANT are connected via the unsuccessful bid for ALD. Once again, it is statistically impossible that some connection between DEFENDANT and HMRC is not present here, either via HMRC waging a proxy war against DEFENDANT via Luck and Brittain or however.



49. There is a 1/723th chance (0.1%) chance that given the above presented facts this postulation is incorrect (1)/(3^5)/2 = 0.07% chance. This is just 35,000 times more likely than a person is to win the lottery and a person is about 100 times *more* likely to play in the premiership during their lifetime.

50. The implication is that this may be a fraudulent set-up / smear campaign on the part of Brittain and the OR with substantial lengths gone to smear DEFENDANT's name, frame him for a crime he simply had no role in, and seize the property belonging to ALD for their own personal enrichment.

51. The possible involvement of HMRC in this and the murky information herein makes this even more complex. Certainly the fake press, the false media accusations and characters, the nefarious use of false and fictitious characters, the strong smear campaign against DEFENDANT and the substantial amount of financial value in the ALD properties, as well as the blemished track record of Brittain indicate that further investigation and facts are required at this point before events are allowed to proceed further according to their own natural schedule.

**Wrongly Established Nature of The Complaint**

52. The Claim cannot be represented as one single lawsuit due to the reason that every individual case for each PLAINTIFF is different and requires therefore an individual suit. This suit was originally filed as a Class Action, alleging "hundreds and maybe thousands" of potential loss-making victims, which were, in the eyes of the PLAINTIFFS, a direct result of the DEFENDANT carrying out the sales of MNY described in the first section of this Memorandum. However, only one, Anthony S., joined the Class Action, resulting in the less than required minimum number of PLAINTIFFS necessary to file such a lawsuit in the Florida Courts.

53. As a result, the original Class Action claim was slightly amended to be inclusive of what amount to seven separate individual suits. However, even despite the lacking number of potential PLAINTIFFS for such a Class Action, the Class Action would have failed the test on the grounds that every individual's circumstances are materially and objectly different from one another. For example, Andrew Hodges traded with the DEFENDANT in two ways; he purchased COE over the Waves decentralised Exchange and directly via a series of pre-agreed over-the-counter trades with other market participants wherein such trades were brokered by the DEFENDANT without commission or fee. In other words, the DEFENDANT did not profit from the transactions that he entered into with Andrew Hodges. Further still, Andrew Hodges was afforded a discount of at least 50% to the then market price of Coeval, meaning that there was no financial risk on the part of the buyer at least as far as the DEFENDANT ensured was the case. This was deliberate as the DEFENDANT did not wish to be responsible directly or accountable for any financial risk assumption on the part of any party that he brokered a transaction for.

**Precedent To Find The Complaint False With Respect To Securities Claims**

54. In SEC vs. Blockvest et al. (https://drive.google.com/file/d/1SODrcousHlAKdFRd8Gj32U7lQc-DQX2X/view) **U.S. District Judge Gonzalo Curiel** found that there was no securitisation claim present when either the injured parties purchased tokens off an exchange platform or when there was no assumption of financial risk. This Judgement has established precedent for the dismissal of the case against the DEFENDANT.

55. Both of these instances apply to the DEFENDANT's transaction with Andrew Hodges and to the other PLAINTIFFS, despite the materially different circumstances under which their alleged losses occurred. For a start, the DEFENDANT has only ever conversed socially and not in financial or investment terms with two of the PLAINTIFFS; the other four PLAINTIFFS are completely unknown to the DEFENDANT and bought or sold accordingly on an exchange completely unbeknownst to the DEFENDANT, who first heard of such individuals when the lawsuit was filed. All these PLAINTIFFS openly admit to having bought Coveal off Waves Decentralised Exchnage in transactions that could have been entered into with any of a wide number of parties, given that both Coeval and Monkey tokens had at the time in excess of 1,000 holders and a thriving, liquid market for trade.

56. As to the question of the nature of the products Coeval and Monkey specifically, they cannot possibly classified as securities by the very nature of their non prefunctional characteristics as currencies with high and low supply bases that were designed in order to be played into software-based smart contract enabled trading systems with artificially-intelligent features.

13

**Additional Evidence Provided By Circumstances Under Which The Complaint Falls**

57. Because MNY and COE are clearly digital currencies designed to be played into artificially-intelligent software-based trading systems with various algorithms that keep them constantly liquid in trading terms, they cannot possibly be classed as securities. Specifically, MNY and COE are designed to pay for things with. At first, the idea was that the tokens would pay for their proxy equivalents that was issued from the smart contract-enabled trading devices as per the source code of the different trading machines. This would generate enough volume and market opportunity ultimately to make the currencies utilisable in a variety of contexts, specifically and most importantly, as units of account for making investments with. Because of the limited supply and unlimited demand in the form of continuous payments being made into the trading devices, the currencies would naturally rise very strongly against Fiat values, making them very efficient purchasers of investments which they would over short periods rise at a much faster rate than themselves if timed for investment accurately. None of this description fits the description of an investment being made into a common enterprise that is then investing money on the token holder's behalf; rather, the token holder holds a unit of currency that the issuer is also using itself to make investments in projects that once profit-generating, are able to circulate such profits into expanding the core architecture, trading systems etc. of the artificially-intelligent trading device.

In fact, in conversations between PLAINTIFF Andrew Hodges and the DEFENDANT, the PLAINTIFF agrees with the DEFENDANT that the tokens are not in any way, shape or form securities (here is the PLAINTIFF referring to the DEFENDANT'S White Paper):





**Broseph** 3:44 AM
i love the talk of that

love it

especially the way you go at the securities definition

it isn't a security. you nailed that

58. The PLAINTIFF alleged that 50 BTC (about $100,000 in mid-2017 money), which is the sum he requests to trade over-the-counter via the DEFENDANT's network of sellers was 5% of his entire portfolio, which the DEFENDANT found a reasonably minimal investment for what was a below-market over-the-counter transaction. Furthermore upon being told this was fine, the PLAINTIFF voluntarily increased his investment size:




**Broseph** 4:07 PM
Since I don't put more than 5% of my portfolio into any one thing I wouldn't be able to invest more than 20btc all together (~$60k USD). Would you be able to do 20btc instead? Def wouldn't dump. Too much work and I know I can never beat the market. Learned that lesson in old economy.

**dmhco**   4:13 PM
Yes. Then it will be ... 400 COEVAL But if you agree not to dump 500

As I will also gift you 100 of my own

I really want long term size holders like you are suggesting you are so that is fine

**Broseph** 4:32 PM



If you can get 2000 coeval for 50btc. You have a deal. I will need 10 days maybe less to move

You should know how you may impact lives.

I will be buying 100 acres of land. Building a farm in order to build a sense of community where I live. I plan to make the business a landmark of the community that impacts everybody's life there. To the point where the community has a checks and a balances effect on all members like tribes use to...to make such an impact that mental health, dietary health, the desire for kids to learn, is created...and to build a family legacy in order for my family to stay close and be a home for more than just my immediate family.

Your sense of community is what is drawing my investment to you. But I want you to know that not all your investors dream for lambos and bitches. Some will try to make an impact much like you are trying to do. I want to ride your coat tails, but I hope to create something where somebody will ride my coat tails, hopefully for good.

59. Since it was agreed and understood by both parties this was not a securities transaction, no KYC or self-accreditation requirement was required to be fulfilled and this was discussed by both parties too:



**Broseph** 7:08 PM
I have not claimed any of my crypto assets so I have not had to get that status in the sec eyes.



**dmhco**   7:16 PM
Yah OK

60. The PLAINTIFF alleges several separate times that he is fully aware of all the risks, agrees with the DEFENDANTs approach to sell MNY into the market, which the DEFENDANT fully explained to him, said that he supported what the DEFENDANT was doing it and was fully aware the financial risk was his own:





dmhco 4:00 AM
I didn't fuck up this time
I did it deliberately
Broseph 4:00 AM
I'll take ur word

---

dmhco 4:00 AM
[illegible]
Broseph 4:01 AM
I understand you Dan. We are both INTPs
dmhco 4:01 AM
But I cannot take a project being undermined by this rationale "this is not how ICOs are done."
That thinking is what we are fighting
But you should fight me in general
That is good
I like the battle
It is healthy and it actually gives credibility to the moves in the market
Broseph 4:02 AM
I see why u are making a market for the ICO
I like it
dmhco 4:02 AM
Yah and also we would have timed out
we could have smashed this thing acceidentally
Broseph 4:02 AM
And yes. I wanted to come at you hard in the slack but my friend said don't
dmhco 4:02 AM
You should
That is freedom of speech
I won't take it persoally

**61.** The extremely short time period of the lawsuit, coming only months after the launch of the planned ICO, and brought forward by a PLAINTIFF who told the DEFENDANT he was a "long-term investor" (implying in most contexts a minimum holding period of a year to three years minimum) is also impractical and prejudiced the outcome of events against the DEFENDANT who nevertheless managed to overcome – at least partially – such events. Contrary to the Claim, PLAINTIFF in fact thoroughly researched the sell-off of Coeval and instructed and informed the DEFENDANT of such sell-off:

[illegible]
Broseph 5:12 PM
Until our mind goes somewhere else
dmhco 5:12 PM
Figure out what the fuck - bbut there is greater repsonsibility and no time to do that
But that wasn't essy to just leave it aside
I wanted to get distracted and find out who the motherfucker was and you know - it is just the discovery that would have given me satisfaction
I don't think I would have had much interest beyond that in what happened
Broseph 5:13 PM
Who are you trying to find?
Why the price crashed?
dmhco 5:13 PM

---

Nah I was thinking - who the fuck yah
Like DDF is most likely
Broseph 5:13 PM
That was a combo of things
dmhco 5:13 PM
Cause they had the incentive
Yah it probably was - you see - because you are objective on this one you have greater insight
Broseph 5:14 PM
From the $1200 high is what you are referring to correct?
dmhco 5:14 PM
Yes
Broseph 5:14 PM
This I can shed light on
Since I looked at about 100+ wallets
Some patterns formed

**dmhco** 5:14 PM
OK ... cool ... oh yeah. What was it

**Broseph** 5:14 PM
Market expectation was 1

**dmhco** 5:14 PM
I am listening I am also packing though
Just FYI

**Broseph** 5:14 PM
People also expected a lower price
No problem

**dmhco** 5:15 PM
Right so they were buying in progressively cheaper?

**Broseph** 5:15 PM
The price was rising so fast the book was thin
As the price rose those set orders didn't follow
A wallet sold a chunk at .5
Wasn't a big wallet
Big the order filled a big portion of the book
The liquidity wasn't there above $800
So when the order hit you actually we're doing your buy high sell low simultaneously
So market expectation was following that behavior
Which accelerated the fall.
The second crash..
Was your big supporters. During the peerchemist issue I saw some big wallets liquidate their entire stash
12 monkeys sold about $300k in a few days
Remember that the price was down significantly at that point. Also khan sold everything..and a handful of other wallets.

**dmhco** 5:19 PM
It makes so much sense to me now



**Broseph** 5:19 PM
So then you were left with hodlers. Why do hodlers suck in a market? Liquidity. The lack of liquidity will continue to drive the price down until you add participants



**dmhco** 5:19 PM
Haha



**Broseph** 5:20 PM
This is why we ant marketing so bad right now. We want anything

**dmhco** 5:20 PM



12 monkeys made that money?



**Broseph** 5:20 PM
Anything will move the needle



**dmhco** 5:20 PM
I don't even wanna think about that

Fucker



**Broseph** 5:20 PM
12 monkeys made almost half a million



**dmhco** 5:20 PM
Fuck

It was the same guys yelling scam



**Broseph** 5:20 PM
Yes

Bc they were out



**dmhco** 5:20 PM
Well karma will deal with him



**Broseph** 5:20 PM
They had nothing to lose anymore

**<u>Premature Filing of This Complaint</u>**

62. Investors were advised explicitly that the planned platform would take at least a minimum of 12 months to launch in a highly-publicized news article in which the DEFENDANT was quoted from the Monkey Capital Slack which was the medium by which investors were primarily updated with news announcements and pertinent information:

> **Link:** https://www.ccn.com/harrisonsons-vc-ico/
>
> **Quote:** "we are realistically going to have this company come together next year (because deals and things when they are done properly always take a year at least; and that is if you are super fast"

63. The news article was published on July 7, a full week after the DEFENDANT told all investors this was the case right at the very start.

64. Since there are no verifiable legal grounds for the basis of this Complaint it is suspected that this Complaint may be part of a bigger and more significant fraud involving a liquidator who already has a history and track record of similar behaviour.

65. In the last week the DEFENDANT heard again from Adam luck, this time reporting about the incident of Absolute Living developments and even mentioning Louise Briitain by name:

> Dear Daniel,
>
> Happy New Year.
>
> I am having a close look at the Absolute Living Developments fallout.
>
> I've read your postings on ALD and a number of questions arose.
>
> In light of the Insolvency Service decision to ban you as a director I wondered why the IS had presumably chosen to ignore your evidence? Or did you simply not present it? Or is it another conspiracy?
>
> As to your stated innocence: I've been in contact with Vicky Chong who states that in your assumed role as the white knight of ALD you took GBP14,500 from her and this has not been reimbursed. Is this correct? She also states that she was told she would have to invest £100,000 in order to continue with the scheme. Why?
>
> There were some other questions that I wanted to put to you please.

1. What was the total pecuniary reward you received from your work with ALD?

2. If these mystery Malaysians were really the power behind the throne at ALD why did all the monies go to UK businessmen, according to the High Court action taken by Ms Brittain.

3. How many other ALD investors did you "assist", did you take money from them, and was this money reimbursed. If not, why not.

4. Will you be attending your impending court case hearing in Florida re Monkey Capital?

Various investors do keep me abreast of your developments and they drew to my attention this curious posting: https://thecurrencyjournal.com/2019/01/11/dmh-advises-government-strategy-session-on-blockchain/

I cannot find any record of a Peter Browshare in relation to a "bi-partisan committee" and I wondered if you could explain which committee and which ministers took time off from Brexit to give you a standing ovation please.

Incidentally, I cannot find any evidence that a John Clare, formerly of the Nikkei and AWSJ, actually exists. Nothing in Factiva nor online that I can trace. Does he really exist or is he just you?

If you could come back to me by Thursday morning please that would be appreciated.

Regards,

Adam Luck.

66. Answers in full to each of these questions was provided by the DEFENDANT online: https://medium.com/@dmhco/just-my-luck-72818986929e

67. The pattern of continued media harassment does not end there. When Judge Middlebrooks found that the default judgement in this case was not against the DEFENDANT Daniel Harrison a news site, Coindesk.com, showed nevertheless that the Judge had found against the defendant personally:

**Re: MAJOR factual error in your story**

Sent: ⌐ ✎ 🔏 Thursday, August 16, 2018 11:47 PM

From: Daniel M. Harrison dmh1980@protonmail.com

To: Stan Higgins stan@coindesk.com

Stan - Thanks for admitting that. Let me tell you the issue I have with the story. The issue that I have with this story is that the story's reporter not only biased the headline and the angle of the story erroneously but then furthermore neither he nor anyone at CoinDesk asked me for comment for the story despite featuring 104 words by David Silver. With this in mind, I ask that we balance the story with the following observations:

1) That the judge explicitly DENIED the default against me
2) With MY 104 words:

At no point in the past 12 months have I abandoned our investors or ceased working on their behalf and anyone who says so should just visit our website at DMH&CO.
By virtue of non-response to the complaint, the Judge defaulted Monkey Capital LLC and Monkey Capital Inc. (Monkey Capital Pte. Ltd.), which are both limited liability companies in which I have a passive shareholding and no active involvement.

I was much heartened towards the United States legal system to see that Judge Middlebrooks denied a motion to default myself despite vehement accusations by the Plaintiffs that I was involved in a corrupt shell-game.

I am not a journalistic novice; I uncovered the Toyota slavery fraud several years back and have edited one published stories by Ben Worford and Nate Thayer among others. I have strong journalistic credentials and I know this is not how stories are reported. Let's agree to publish my words - equal to David's in court with no hyperlinks or specials etc. and admit the judge denied this explicitly in the story against me and I will accept it was a genuine error and frankly, have nothing on you whatsoever at that point.

Daniel

Sent with ProtonMail Secure Email.

------- Original Message -------
On August 16, 2018 11:18 PM, Stan Higgins <stan@coindesk.com> wrote:

No need to apologize - the fuck up was on our end.

Best,
Stan

Sent from my iPhone

68. The publication admitted "the f--- up was on our end". The problem was that since the news had already hit the digital news feeds, there was simple no way to stop the propagation of the FACTUALLY AND LEGALLY FALSE headline.

69. Other reporters have continued to harass the DEFENDANT in the interim and his friends, which are clearly sent by the PLAINTIFFS.

70. The logical assumption is further enforced that this is a spurious lawsuit that is designed to damage the media imagine of the DEFENDANT and to extort him into making a payment to the PLAINTIFFS of some kind. It is also possible this lawsuit is brough because the PLAINTIFFS associates, being Louse Brittain et al., genuinely believe the DEFENDANT is involved in the money laundering activities concerning ALD which is not the case. In such instance one potential strategy is to try and force the DEFENDANT into making a payment form what they falsely suspect is an illicit account full of cash holdings.

**Motion To Order PLAINTIFFS Full Disclosure of Parties Incl. Transcripts**

71. As stated previously, the likelihood of Adam Luck being connected by coincidence along with Louise Brittain and the Official Receiver for Absolute Living Developments to this lawsuit, which, via the initial writing of the article in The Times a year ago is warranted as being the case, is extremely low without such connection

somehow being established via the PLAINTIFFS. It is so low as to be impossible, in fact.

72. The extremely low likelihood of such crossover of interests and connections of parties without potential malicious intent to smear the name of the DEFENDANT and without ongoing possible fraud and serious crime being committed on the part of the PLAINTIFFS warrants the **necessity for the urgent and immediate** disclosure on the part of the PLAINTIFFS and on the part of their attorneys as to the details of any relationship they hold or have held with any of the following parties <u>EVEN IF NOT SPECIFIC TO THIS CASE but still involving discussion of the DEFENDANT somehow</u>:

- **Interpublic Group of Companies (IPG) and any of its affiliated or connected or owned brands or companies or personnel, a company(s)**
- **Adam Luck, an individual (whether IPG-related or not)**
- **Louise Brittain, an individual**
- **Wilkins & Kennedy LLP, a company**
- **UK HMRC personnel or affiliated or connected parties**
- **Ken Beardsley, an individual**
- **Sean Gleason, an individual**
- **Official Receiver for ALD**
- **Absolute Living Developments, a company**
- **Alan Ma, an individual**
- **George Leong, an individual**
- **News Corporation and any of its affiliated or connected or owned brands or companies or personnel**
- **Goldseek.com, a company**
- **Peter Spina, an individual**
- **Chris Waltzeg, an individual.**
- **Benjamin Greenmaiden, an individual**
- **Associated Press News and any of its affiliated or connected or owned brands or companies or personnel**
- **Intermediaries or connected parties of the abovementioned**
- **Coindesk.com, a company**
- **Digital Currency Group, a company**
- **Stanley Higgings, an individual**
- **Peter Rizzo, an individual (editor. Coindesk)**
- **Nicolas Dy, reporter, an individual**
- VAHRAM HARUTYUNYAN , an individual

73. To the extent that it is acceptable to the courts the DEFENDANT is presently in discussions to sue the PLAINTIFFS and their attorneys and any affiliated parties for the sum of the market which they destroyed that being $120 million. Further damages for personal injury will also be added to this claim. The PLAINTIFFS knowingly

falsely filed a spurious lawsuit claiming that events that they themselves committed to transpire were the fault of the DEFENDANT, and used the media through nefarious means to manipulate and extort the DEFENDANT into paying them monies they were not due.

74. It is therefore asked that it be ORDERED that the PLAINTIFFS immediately disclose any and all relationships with any and all of the abovenamed parties and specifically provide details with respect to their communications with these parties under Oath including copies of e-mails, transcripts of phone conversations and any and all details of their knowledge of these people and events.

I hereby submit that this statement under Oath.

Respectfully Submitted,

Daniel Mark Harrison
London, U.K.

**CERTIFICATE OF SERVICE**

**I HEREBY CERTIFY** that a copy of the foregoing was posted by mail with the Clerk of Court on this day of Friday 18th January 2019 and by e-mail to Judge Middlebrooks and to **DAVID C. SILVER at** DSilver@SilverMillerLaw.com.

Size 3
Made in the UK SKU No. 38519228

FSC
MIX
Envelope from responsible sources
FSC® C002233

5 013872 027988 >

ORIGIN ID:HRTA 07366166114
PFW DAVIEL MARK HARRISON
1 GREVILLE ROAD

LONDON, LO NW65HA
UNITED KINGDOM GB

SHIP DATE: 16JAN19
ACTWGT: 0.20 KG
CAD: 100892065/WSXI2300

BILL SENDER

TO CLERKS OFFICE

701 CLEMENTS ST
ROOM 202
WEST PALM BEACH FL 33401 (US)

REF: EE687174587GB
INV:
PO: DEPT:

FedEx. Express

E

10:30A
INTL PRIORITY

TRK# 7742 4486 1786
0430

XH PBIA

33401
FL-US PBI



